HONEYMEAD PRODUCTS COMPANY AND ANOTHER v. AETNA CASUALTY & SURETY COMPANY AND OTHERS.

146 N. W. (2d) 522.

October 28, 1966—No. 39,609.

*Doherty, Rumble & Butler, R. J. Leonard, Eugene M. Warlich, Dorsey, Owen, Marquart, Windhorst & West,* and *Peter Dorsey,* for appellants.

*Clausen, Hirsh, Miller & Gorman, Donald N. Clausen, John P. Gorman, Jacob T. Pincus, Faegre & Benson, Wright W. Brooks,* and *Farrish, Zimmerman, Johnson & Manahan,* for respondents.

THOMAS GALLAGHER, JUSTICE.

Action by Honeymead Products Company, which operates a soybean oil storage and processing plant in Mankato, and Farmers Union Grain Terminal Association, lessor of the processing facilities, against some 60 insurance companies for approximately $3,000,000 damages which plaintiffs claim resulted from the "explosion" of a steel oil storage tank (referred to hereinafter as the No. 1 tank) in Mankato; and which they claim were within the coverage of defendants' insurance policies against "direct loss by * * * Explosion."[1] The jury determined that plaintiffs' damages were not the result of an "explosion" of the tank referred to, and from an order denying their alternative motion for judgment notwithstanding the verdict or a new trial plaintiffs take this appeal.

Plaintiffs contend (1) that the court should have instructed the jury as

---

[1] Each of the policies contained a section entitled "Provisions Applicable Only to Explosion." They included the following provisions:

"The following are not explosions within the intent or meaning of these provisions:

"(a) Concussion unless caused by explosion,

"(b) Electrical arcing,

"(c) Water hammer,

"(d) Rupture or bursting of water pipes.

"Any other explosion clause made a part of this policy is superseded by this endorsement."

to various meanings of the word "explosion" as it is commonly understood—that "explosion" could mean "a bursting with great noise and violence"; "bursting noisily"; "a bursting"; "a violent expansion or bursting with noise," because explosions are commonly understood to include such factors; (2) that the court should have further instructed the jury as to the meaning of the word "explosion" when it requested additional advice with respect thereto; (3) that the court should have permitted the jury to examine the insurance policies; and (4) that the court should not have received testimony with respect to other insurance of plaintiffs against loss of oil by reason of "Fracture, Rupture—Anything That Would Cause a Discharge or Leakage of the Oil Except 'Explosion.'"

Each of defendants' policies included identical sections insuring plaintiffs against loss resulting from the "explosion" of their oil storage tanks and provided further that "[c]oncussion unless caused by explosion" is not an explosion "within the intent or meaning of these provisions."

The accident occurred January 23, 1963. At that time, plaintiffs' No. 1 tank, with a capacity of 3,600,000 gallons, was filled to a level of 32 feet 6 inches with 2,800,000 gallons of soybean oil which weighed approximately 7.7 pounds per gallon for a total weight of 21,560,000 pounds. This tank was 116 feet in diameter and 40 feet 6 inches high. It was made with a steel bottom and covered by a light conical steel roof. Its walls were made up of steel plate courses welded together, varying in thickness from $5/8$ of an inch at the bottom course to $3/16$ of an inch at the top. It was erected in Mankato in 1955 from used steel plate reclaimed from an old tank built in Oklahoma in 1929. In 1961 an opening measuring 8 by 8 feet had been cut in the bottom steel plates of this tank so as to permit a front-end loader to enter it for cleaning purposes. An oil-tight door for this opening was also installed some months later.

On the date of the accident the outside temperature was minus 21 degrees Fahrenheit. At about 9:15 a. m. on that date, the steel plate walls of the tank suddenly burst apart, ripping and tearing an opening on a line perpendicular to the door and extending upward from its top for a distance of approximately 30 feet, and thence tearing at right angles laterally about 90 degrees in both directions so that the steel plates were bent backwards "like doors or wings." The 2,800,000 gallons of soybean

oil were suddenly released at that time and came rushing out "like water through a broken dam," causing the loss and damages for which this action was brought.

Witnesses who were in the near vicinity of the occurrence testified that the bursting of the tank was accompanied by what was described variously as "a terrible noise * * * regular rumble"; "far away thunder"; "a dynamite blast * * * off in the distance"; "a sonic boom"; a "rumble like thunder"; "a whoom"; "a report or bursting * * * a real crack"; a "roar-like * * * loud"; "a large boom."

There was testimony that no glass windows or other like objects were broken in any of the houses adjacent to the tank and that there was no evidence of burning, charring, or combustion of the oil or of any substance in or around the tank, or that any property was damaged in the vicinity other than by the massive flow of oil which followed the rupture of the tank.

Honeymead's executive vice president, Mr. Lowell Andreas, on the afternoon of the explosion wired the Chicago Board of Trade as required by its rules as follows:

"We wish to report the rupture of our soybean oil storage facility at Mankato, Minnesota, resulting in the substantially total loss of soybean oil under Chicago Board of Trade warehouse receipts, * * * at approximately 9:00 a.m., January 23, 1963, loss has been reported to the insurance carrier."

Expert witnesses called by defendants testified that in their respective opinions the tank had burst when the extreme cold weather had caused the steel plate walls to lose most of their ductile qualities and to become brittle; that in addition the front door opening had produced stress concentration points, especially at the corners of the door where about 353,800 pounds of force had been concentrated; and that the cold weather which caused the metal to become brittle had produced a phenomenon known as "cold weather fracture" at such pressure points. They testified further that after the tank had ruptured at the upper corners of the door the break had extended upward at a speed of between 2,000 and 2,500 feet per second.

Defendants presented other experts who testified with respect to the characteristics of an "explosion." One such witness testified that a characteristic of an explosion is a sudden increase in pressure, generated by the sudden formation of gas and giving off of heat, and that while ordinarily noise accompanies an explosion neither the presence of the noise, vibration, nor the release of energy would necessarily mean that an explosion had occurred, citing as an example the breaking of a dam followed by the sudden release of water, which is usually accompanied by noise and a release of energy but is not regarded as an explosion.

An expert called by plaintiffs testified that an increase in internal pressure is not necessary to an explosion and that "[t]he characteristics of an explosion, whether caused by chemical or physical means, is a sudden expansion or bursting associated with noise, with a sudden release of energy which has the capacity of doing great damage."

Mr. Harold Groh, Honeymead's assistant secretary, testified that engineers employed as inspectors by the Fire Underwriters Inspection Bureau had inspected the tank on three occasions between the time when the door was installed and the accident and that the inspection bureau had never made any recommendation that the structure should be modified.

During cross-examination he was asked:

"Q. Now you were also required to obtain insurance for Honeymead against the peril of this tank being ruptured or fractured by some reason other than explosion. Isn't that a fact?

"Mr. Leonard [counsel for plaintiffs]: If the Court please, that's objected to as being wholly immaterial to any issue in this case.

"The Court: I think that may not be material to this case but he may answer the question.

"Q. (By Mr. Gorman, continuing) [counsel for defendants] Isn't that a fact, sir?

\* \* \* \* \*

"A. Yes.

"Q. And you did have insurance at the time of this occurrence protecting Honeymead insofar as tank No. 1 is concerned against the loss of the oil from that tank by reason of fracture, rupture—anything that would cause a discharge or leakage of the oil except explosion.

\* \* \* \* \*

"Mr. Leonard: Same objection, Your Honor.

"The Court: Overruled.

"Q. (By Mr. Gorman, continuing) Isn't that so?

"A. Yes.

\* \* \* \* \*

"Mr. Leonard: This is highly prejudicial. If this wasn't so important, Your Honor, I would move for a mistrial \* \* \*. I respectfully request the Court to instruct the jury to disregard the question and to sustain my objection to its materiality \* \* \*."

At the close of the testimony, plaintiffs submitted written requests for instructions which included the following:

"\* \* \* [T]he sole question for you to answer is whether there was an explosion of Tank 1. In deciding this question, you are instructed the word explosion is an idea of degree and the meaning of the word in each case must be settled not by any fixed standard or accurate measurement but by the ordinary use of the word, the common experience of men and their general notions in matters of this sort. The word is to be construed in its popular sense, that is, as ordinary men, not scientists, use and understand it.

\* \* \* \* \*

"The word explosion is variously defined \* \* \*:   One definition is:

"A violent bursting with noise following a sudden release of pressure, as in the description of a steam boiler.

\* \* \* \* \*

"Another definition is:

"A sudden violent bursting or breaking caused by internal force and accompanied by a sudden or rapid expansion of air and a sharp noise or report.

\* \* \* \* \*

"Even noise is not required for finding an explosion although explosions may be and usually are accompanied by noise.

\*   \*   \*   \*   \*

"Many of the above definitions do not require combustion or smoke, or fire, or charring or heat, or the presence of gases or the ignition of any volatile substance, or the increase of internal pressure and none of these things are required in this case.

\*   \*   \*   \*   \*

" 'Explosions are characterized by release of energy so rapid as to appear substantially instantaneous. An explosion is an effect, not a cause.' "

In his final argument, counsel for defendants stated:

"\* \* \* Mr. Harold Groh \* \* \* has testified \* \* \* he had to have rupture insurance, fracture insurance; the peril of discharge of this oil other than from the cause of explosion. This company had insurance covering this."

After this statement the following occurred:

"Mr. Leonard: \* \* \* [D]uring counsel's argument, counsel stated and made quite a reference to the fact of other insurance. This is, by an order of this Court, not an issue in this case. His comment was highly contemptuous, highly prejudicial and would be grounds for a mistrial. \* \* \* [P]robably the only thing we can do at this stage, and I want to reserve my position more fully for a later occasion, is to request, Your Honor, to state to the jury that there is no evidence in this case with reference to other insurance coverage, and that the comment by counsel should, therefore, be disregarded as not a proper statement to have been made."

With respect to the meaning of the term "explosion" the court instructed the jury as follows:

"The plaintiffs do not have to prove how the explosion occurred, if they do so prove. \* \* \*

"Now the word explosion does not always mean the same thing at every time. It has been used to describe many kinds and types and degrees of occurrences. Its general characteristics may be set out, but the exact facts which constitute what we call an explosion cannot always be stated so as to distinguish the occurrence.

"There is no fixed standard or accurate measurement, either in ordinary speech or in the law—we must then go to the ordinary use of the word in its popular sense.

"I told you that the policies of insurance provide coverage for loss by explosion. When the word explosion was used in the policies, the officers or the agents of the defendant insurance companies, as ordinary people, and the plaintiffs who were insured as ordinary people, would be presumed to have used and understood the word in its ordinary and popular sense.

"For your guidance then, the word explosion is defined as the act of exploding; detonation, a violent bursting or expansion with noise, following the * * * sudden release of pressure, as in the disruption of a steam boiler. Also a noise made by such bursting."

With respect to the testimony and argument of defendants' counsel as to rupture or fracture insurance covering the peril of discharge of oil from causes other than explosions, the court instructed the jury as follows:

"* * * You are aware from the evidence that other insurance was carried by the plaintiffs. That has no bearing in considering this case, and your only duty here is to decide if there was an explosion. If there was your verdict will be for the plaintiffs, if not, for the defendants."

After the jury had first retired, it returned for further instructions and the following occurred:

"Mr. Ballard [foreman]: * * * We are having difficulty determining the meaning of the word explosion, as it can be interpreted two or three different ways * * *.

"The Court: * * * [T]he Court did state that the word explosion could be interpreted several different ways, and gave you one explanation of it.

"I think you will have to draw from all the evidence you have heard, all the descriptions which may have been given to you, and as I told you, from your experience in life, to make the determination upon that.

* * * * *

"Mr. Ballard: * * * [T]here is some question about the insurance papers that are involved in this case.

"The Court: * * * [T]he Court determined early in the case that the policies would not be necessary for the jury's determination, since * * * your only determination would be whether or not there was an explosion. If, as I told you earlier, there was an explosion * * * the policies of insurance would cover, and then your verdict would be for the plaintiffs.

"If there was not an explosion * * * then the policies would not cover, and your verdict would be for the defendants."

■ The evidence clearly establishes that plaintiffs' damages were the result of a fracture of the steel plates forming the walls of the No. 1 tank and that this was in turn caused by pressure which arose from the weight of the oil stored within the tank as applied against the brittle steel in the area where the door has been constructed. The fracture permitted release of the massive oil contents within the tank with resulting noise and destruction. There was no evidence of any sudden or violent *increase* of internal pressure commonly associated with an explosion. While this court has not had occasion to pass upon the meaning of the word "explosion" as used in insurance policies of the type here involved, a number of jurisdictions have considered the question. In Aetna Cas. & Surety Co. v. Osborne-McMillan Elev. Co. 26 Wis. (2d) 292, 299, 132 N. W. (2d) 510, 513, involving the rupture of grain storage containers, the court stated that—

"* * * explosion as applied to * * * contents of a container must include the element of an active force independent of or in addition to the force of weight and height of the contents which seek a sudden and violent release by breaking the container. Static or potential force or pressure resulting only from the weight of the contents in a container may cause a container to split open and release the contents but such an occurrence is hardly looked upon by the average person to be an explosion.

* * * * *

"* * * We do not agree * * * that all ruptures and burstings of containers * * * are explosions. * * *

"There seems to be little dispute in the cases that an explosion as commonly understood is not one element such as an increase in pressure or noise or a result such as a fractured container, but the sum total of several elements not the least of which consists of an active force which suddenly and violently exerts itself in some form. * * * In cases of confined substances if the container fails because of structural weakness so as to let out the contents as distinguished from the contents bursting out because of its force, there is no explosion even though it might be said the tank ruptured or burst open. * * * In explosions involving a nonexplodable substance there must be an internal active force created which breaks out of its confinement. In the case of grain such active force must be in addition to that of the normal static force exerted on the inside of a container because of the weight and position of the grain."

Decisions of a number of other courts are similar. Thus, in American Cas. Co. v. Myrick (5 Cir.) 304 F. (2d) 179, 183, it was said:

"Although the cases admit that 'explosion' is a term insusceptible of fixed definition, they make it clear that in order for an occurrence to constitute an explosion there must be a sudden breaking forth of a confined substance as a result of an *internal force* * * *." (Italics supplied.)

Likewise, in Peterson v. Royal Ins. Co. 251 N. C. 61, 64, 110 S. E. (2d) 441, 443, the court stated:

"Internal pressure causing a sudden expansion resulting in bursting or disruption are essential elements of an explosion."

In Hulcher Soya Products, Inc. v. Millers' Mutual Fire Ins. Assn. 5 Ill. App. (2d) 235, 124 N. E. (2d) 570 (a memorandum decision), the record disclosed that there was no direct evidence of a sudden development of an internal force or that the incident which was characterized by plaintiff as an explosion was accompanied by a rapid or sudden expansion of air.

So here the fact that normal pressure from the stored oil caused the plates to fracture would appear to rule against any finding that the fracture was due to an "explosion" caused by a sudden or violent increase of pressure from within the tank.

■ Plaintiffs contend that they were entitled to instructions giving the jury many additional definitions of the term "explosion." The court did instruct it as to the popular meaning of the term and incorporated in its instructions many of plaintiffs' suggested definitions, even though they were phrased in different terms. Thus, when the court explained that an explosion is defined as an "act of exploding; detonation, a violent bursting or expansion with noise, following the sudden production of great pressure," this was reasonably within plaintiffs' requested instruction that an explosion could mean: "A bursting with great noise and violence"; "[b]ursting noisily"; "[a] bursting"; "a violent expansion or bursting with noise."

We find no decisions which hold that multiple definitions of a word or term involved in a contract or policy must be given to the jury. Rather, some definition within the popular concept of the term in issue seems to be appropriate. Had additional definitions been given, the multiplicity might well have resulted in confusing the jury. Based on the evidence and the principles ordinarily applicable, we conclude that the instructions here, when considered as a whole, were without error and conveyed to the jury a clear concept of its responsibility in arriving at a decision. See, Barnes v. Northwest Airlines, 233 Minn. 410, 47 N. W. (2d) 180.

■ It is contended that the trial court erred in refusing to permit the jury to have possession of the insurance policies during its deliberations. Examination of such policies reveals nothing which would have been of assistance to the jury in determining the fact issues involved. The only references therein to the term "explosion" are that the properties of plaintiffs were insured against loss resulting from the explosion of oil storage tanks and that concussions, unless caused by explosion, and other defined mishaps were not to be regarded as explosions within the intent or meaning of the policies. From this it seems clear that possession of the policies would not have aided or assisted the jury in arriving at a conclusion. It is well established that the construction of words and clauses as used in insurance policies ordinarily is a matter of law for the court rather than a question of fact for the jury. 29A Am. Jur., Insurance, § 1946. See, also, Bauman v. Midland Union Ins. Co. 261 Wis. 449, 53 N. W. (2d) 529; Tires, Inc. v. Travelers Fire Ins. Co. (4 Cir.) 253 F.

(2d) 411. Accordingly, here the function of the court was to instruct the jury as to the meaning of the word "explosion" and submit whether under the definition given an explosion had occurred. This was exactly the procedure followed, and we find no error therein.

■ Plaintiffs contend that there was error in the admission of evidence indicating the existence of insurance policies which insured plaintiffs against loss by reason of ruptured or fractured tanks, and in the statements in the final argument of defendants' counsel pointing out the existence of such insurance to the jury. When this evidence was received over objection the court justified its admission on the theory that since plaintiffs' counsel had inquired of its witnesses as to inspection of the newly installed door by inspectors of other insurance companies, this gave defendants the right to establish that, notwithstanding such inspections, the installation of the door may have been defective. While defendants no doubt had the right to inquire as to the scope and purpose of the inspection referred to, it seems clear that this would not justify questions which brought to the attention of the jury the fact that plaintiffs carried insurance which protected them against loss due to fracture or rupture of the tanks. However, the procedure, adopted at the request of plaintiffs' counsel, which followed both the admission of this evidence and the final argument of defendants' counsel would seem to have been adequate to correct the errors described. As indicated above, at both such times plaintiffs' counsel made clear to the court that plaintiffs did not seek a mistrial because of the errors described but would be satisfied with an instruction which would correct any impression of the jury that the other insurance might have some bearing upon its consideration of the case. The court complied with this request and plainly charged the jury that it should not consider the evidence concerning such insurance and that its "only duty" was "to decide if there was an explosion."

On a number of occasions we have held that a new trial should not be granted for the erroneous admission of evidence where the court has distinctly instructed the jury to disregard it. Zuber v. N. P. Ry. Co. 246 Minn. 157, 74 N. W. (2d) 641; Mutual Service Cas. Ins. Co. v. Overholser, 239 Minn. 243, 58 N. W. (2d) 268; Walker v. Stecher, 219 Minn. 152, 17 N. W. (2d) 317; Arnold v. Northern States Power Co.

209 Minn. 551, 297 N. W. 182. While it is true that in some instances the erroneous admission of evidence has compelled reversal notwithstanding a corrective instruction with respect to such evidence, Jeddeloh v. Hockenhull, 219 Minn. 541, 18 N. W. (2d) 582; Evans v. Chicago, M. & St. P. Ry. Co. 133 Minn. 293, 158 N. W. 335, nevertheless each case must be judged on its own particular facts; and here where the issue relates to the exercise of the trial court's discretion in denying plaintiffs' motion for a new trial, Manahan v. Jacobson, 226 Minn. 505, 33 N. W. (2d) 606, under the facts above recited we cannot see where there was any such abuse.

Affirmed.

MR. JUSTICE SHERAN took no part in the consideration or decision of this case.