AETNA CASUALTY & SURETY COMPANY and others, Appellants, v. OSBORNE-MCMILLAN ELEVATOR COMPANY, Respondent.*

*April 11—June 9, 1967.*

\* Motion for rehearing denied, with costs, on August 22, 1967.

518

For the appellants there were briefs by *Francis J. Wilcox* and *Wilcox & Wilcox*, all of Eau Claire, and by *Donald N. Clausen* and *Clausen, Hirsh, Miller & Gorman*, all of Chicago, Illinois, and by *R. E. Anderson* and *Hughes, Anderson, Davis & Witkin*, all of Superior, and oral argument by *Francis J. Wilcox*.

For the respondent there was a brief by *Robert H. Gee* and *Powell, Gee & Powell*, all of Superior, and by *Peter Dorsey, William A. Whitlock*, and *Dorsey, Owen, Marquart, Windhorst & West*, all of Minneapolis, Minnesota, and oral argument by *Robert H. Gee* and *Peter Dorsey*.

HALLOWS, J.  This case is making its second visit to this court. It involves the question whether a steel storage tank containing grain exploded within the meaning of the term "explosion" in an insurance policy. In the

first trial the jury found there was an explosion but on appeal we reversed and granted a new trial because of error in instructing the jury on the question of what constitutes an explosion. *Aetna Casualty & Surety Co. v. Osborne-McMillan Elevator Co.* (1965), 26 Wis. (2d) 292, 132 N. W. (2d) 510. Upon the retrial, the jury again found the grain elevator exploded and judgment was entered upon the verdict for $483,320.89 damages together with $91,884.43 interest and $19,705.12 costs, for a total of $594,910.44. A year after the second trial the Minnesota supreme court decided an explosion case which the appellants claim is determinative of the Minnesota law which is applicable to this case. Again before us are questions relating to what constitutes an explosion as the term is used in an insurance policy, the sufficiency of the evidence, and the correctness of rulings on motions and of the instructions to the jury.

The physical facts on this appeal are essentially the same as on the first and most of them are set forth in our previous opinion but some must be repeated to give a background understanding of the present issues. This action was commenced for declaratory relief by 44 appellant insurance companies (the insurance companies) to determine their liability under insurance policies for a loss suffered by the defendant-respondent Osborne-McMillan Elevator Company (the elevator company). One policy insured the buildings and the equipment and the other policy insured contents against various perils including explosion under an extended-coverage endorsement.

The elevator company operated a grain elevator at Superior, Wisconsin, which consisted in part of a battery of concrete storage bins and four cylindrical steel storage tanks located along a slip on a dock in Lake Superior. The steel tank in question was 80 feet in diameter with sidewalls 80 feet high surrounded by a conical steel roof. The tank was built by welding together 10 tiers of steel plate of varying thickness each about eight feet high.

The bottom tier was welded to a flat baseplate composed of 16 separate steel three-fourths-inch thick arc segments eight feet wide which were welded together to form a circle. However, the 16 segments did not quite complete the bottom circumference of the tank; a small gap remained between two of the segments and was filled in with a small filler base which was improperly and incompletely welded into the gap. This defect constituted a notch or discontinuity in the steel baseplate, which significantly increased the amount of stress flowing through the steel around the notch. The baseplate with the defective weld was bolted by 128 one-inch anchor bolts to a concrete platform. Thus the monolithic storage tank was secured to its concrete base.

It is conceded that steel contracts a known quantity for every degree of drop in temperature and when exposed to low temperatures, such as the 27 degrees below zero which existed on January 17, 1962, the day in question, steel is extremely brittle. It is undisputed that the circumference of the steel wall of the tank at 27 degrees below zero would normally have contracted more than two inches from its size at 95 degrees above zero. The tank, built in 1958, was designed to support and contain 361,000 bushels of wheat. Wheat was first placed in the tank in March of 1959, and it was well filled in June of 1961, when the temperature was around 93 degrees. The last movement of grain was on June 29, 1961, when 4,000 bushels were removed. On January 17, 1962, the tank contained 361,000 bushels of wheat which weighed 21,660,000 pounds.

On January 17, 1962, about 1 o'clock in the morning when the temperature was about 27 degrees below zero, after having fallen from 30 degrees above zero at 6 p. m. on January 13th, the tank suddenly burst or, as the jury found, exploded. The initial fracture in the tank traveled vertically from the defective weld in the base plate up through the 10 tiers of steel plates, opening the tank

from bottom to top. Within a fraction of a second, other fractures occurred elsewhere splitting the cylindrical wall into three major segments. One segment of the tank weighing approximately 87,100 pounds was folded over and was at its nearest point about 108 feet from the concrete platform. Another segment weighing approximately 75,921 pounds was wrapped backward around an adjoining tank which was caved in about 13 inches for a distance of 22 feet along its circumference. The third segment weighing 145,163 pounds was found in the slip adjacent to the pier with its bottom course 94 feet from where it had been attached to the concrete platform. About one half of the anchor bolts had snapped in tension; the other half had been sheared off and all were bent away from the center of the tank. The roof of the tank settled in almost a vertical path. The wheat came to rest in various levels of repose; approximately 100,000 bushels went into the adjacent slip. A portion of the grain was found 187 feet from the outer edge of the tank and generally covered a larger area than such volume would in a conical shape of repose caused by gravity. While there was no burning, charring, or combustion of the wheat, there was at the time of the occurrence vibration of the frozen ground and also an extremely loud noise.

The disputed fact issue concerned the elasticity of the wheat and its effect on the occurrence. The insurance companies claim the compressed wheat did not possess any appreciable elasticity or active internal force, that there was no sudden and violent increase of an internal pressure but only the passive resistance of the grain to a gradual compaction and such force played no part in the occurrence which was caused by the initial cold-weather-brittle fracture. The elevator company contends an active internal force existed in the compacted wheat, over and above the passive resistance, which active force contributed to the sudden and violent bursting of the storage tank and it is not necessary that such force be a cause

of or contribute to the initial fracture, but in fact the evidence showed that it did contribute significantly.

In our first opinion we stated an explosion was a combination of several elements including such factors as increase in pressure, noise, a result such as a fractured container and not the least of which was an active force which suddenly and violently exerted itself in some form. Applying this concept to a nonexplodable substance, we stated, "The probability of grain like water which is not an explodable substance being an element of an explosion consists in its ability to contain or harbor active forces or energy. In explosions involving a nonexplodable substance there must be an internal active force created which breaks out of its confinement. In the case of grain such active force must be in addition to that of the normal static force exerted on the inside of a container because of the weight and position of the grain." 26 Wis. (2d) at 302.

The appellant contends the law requires a sudden and violent increase of the internal active force and argues this is required by our original opinion and by the subsequent opinion of the Minnesota court construing the Minnesota law which is applicable to the facts. The language of our first opinion did not require a sudden and violent increase in the internal active force to constitute an explosion. The increase of the internal force must manifest itself in a sudden and violent action such as a sudden and violent release by breaking the container, but to do this the increase of a nonexplodable substance like grain need not be sudden although in explodable substances there usually is a sudden buildup of pressure or force due to a chemical or nuclear reaction. We expressly stated the pressure required for an explosion to take place "need not be unusual, abnormal, or suddenly produced." 26 Wis. (2d) at 304. There is a distinction between a sudden and violent increase and a sudden and violent release. It is the sudden and violent release of the force which is an essential element of an explosion.

More than a year after the second trial was concluded in September, 1965, the Minnesota court on October 28, 1966, decided *Honeymead Products Co. v. Aetna Casualty & Surety Co.* (1966), 275 Minn. 182, 146 N. W. (2d) 522. The *Honeymead Case* involved a reconstructed storage tank containing 2,800,000 gallons of soybean oil. The temperature dropped to 21 degrees below zero and the tank wall suddenly burst apart starting in an area where a door in the tank had been constructed. In a suit to recover on insurance policies on the theory there was an "explosion," the jury found for the insurer. On appeal, the Minnesota supreme court held that the normal pressure from the weight of the stored oil caused the brittle plates of the tank to fracture and the fracture was not due to an explosion ". . . caused by a sudden or violent increase of pressure from within the tank." The court also said there was no evidence ". . . of any sudden or violent *increase* of internal pressure commonly associated with an explosion." 275 Minn. at 191, 192, 146 N. W. (2d) at 528, 529. From this language the insurance companies argue the court found an essential element of an explosion to be a sudden or violent increase in internal pressure. We think not. The language used must be taken in reference to the fact that there was no increase in the pressure of the soybean oil, sudden or otherwise, over that of its weight and position in the tank. The decision quoted with approval from our first opinion wherein we pointed out an element of explosion was the sudden and violent release of the pressure from the container. 146 N. W. (2d) at 528. We do not read the *Honeymead* decision as modifying our first opinion or holding an explosion can only occur if there is a sudden or violent increase of internal pressure in the tank.

The appellant argues its motion for a directed verdict should have been sustained because there was no expansion of wheat while the tank wall was intact, the fracture of the wall of the tank was a cold-weather-brittle fracture, and the gradual compaction of the wheat caused by

the contraction of steel walls resulted only in the creation of passive resistance, which played no part in the occurrence until after an initial fracture of the wall. Of course, there was no physical expansion of the compacted mass of wheat while the tank was intact, but the jury found there was an internal force in the wheat seeking expansion or "modulus of elasticity" or a "desire" to return to its original shape. The actual expansion of the mass of wheat took place upon a bursting of the tank and its release from confinement; that is all an explosion requires of this element.

We think the initial fracture of the brittle steel wall of the tank cannot be solely and exclusively attributed to the incomplete weld at the base of the tank. If the fracture of the tank was due solely to the cold-weather-brittle fracture, the phenomena would be commonly called a rupture or a bursting and might have taken place in an empty tank but more easily in a full tank because of the added pressure of the weight of the wheat. It is difficult to isolate the first or initial fracture in the tank in the concept of an explosion when there are other almost simultaneous fractures which together disintegrate the tank. The phenomenon called an explosion must start somewhere and begin with something.

In this context we can agree with the insurance companies' argument that the active internal force of the wheat must be a cause of the initial fracture of the tank, but it need not be the exclusive cause. When an explosion of a confined substance occurs, the container normally fractures. If the internal force is great enough, the container must give or fail. The greater the resistance offered by the container, the more violent the inevitable break. Some containers are so weak in resistance as not to be explodable. But the brittleness of metal, the fatigue of metal or a defect in the metal container are reasons why the container failed against the onslaught of a more powerful internal force seeking its release. If the com-

pressed wheat exerted sufficient pressure upon the steel tank to cause it to suddenly and violently break, then that element of an explosion exists. It is not only the weakness of the container which must be considered but also the strength of the internal force. The explosion *per se* is more an effect than a cause, although it in turn can be the cause of other damage.

Although there is some evidence that a cold-weather-brittle fracture could occur in an empty tank, this does not render irrelevant the question whether or not the compressed wheat harbored a modulus of elasticity. We are dealing with what happened, not what could have happened.

We think there is credible evidence that the wheat contained an active internal force resulting from the gradual contraction of the steel wall in addition to the passive resistance of the grain to compaction. The jury could find as it did that there was a desire on the part of the wheat to regain its original uncompressed position. While the insurance companies have argued the testimony of the experts support their view, such interpretation is not the only one which can be given to the testimony. A jury issue was presented and it was for the jury to decide which inferences to draw and which experts to believe. It did not agree with the insurance companies' contention. We cannot say as a matter of law the jury's view of the testimony was erroneous. It would serve no purpose to review the technical testimony. The jury found there was an explosion. This means the wheat, because it was compressed by the contracting wall of the tank, had an active internal force which exerted itself against the wall over and above any passive resistance and in addition to the force of its weight and position, and this active force was sufficient to cause additional or increased stresses and strains in the wall of the container which were multiplied at the notch to the point the brittle steel could no longer withstand the

strains and stresses and gave way in such a sudden and violent manner that it must be held an explosion took place within the meaning of the insurance policies.

We must arrive at this conclusion because if there is credible evidence which under any reasonable view supports the verdict, we ought not disturb it even though a contrary finding, if made by the jury, would likewise be sustainable. *Springen v. Ager Plumbing & Heating, Inc.* (1963), 19 Wis. (2d) 487, 120 N. W. (2d) 692; *Heritage Mut. Ins. Co. v. Sheboygan County* (1962), 18 Wis. (2d) 166, 118 N. W. (2d) 118. On review we must view the evidence in the light most favorable to the verdict, otherwise there is not much use for the jury system. *Ziegler v. Wonn* (1963), 18 Wis. (2d) 382, 118 N. W. (2d) 706.

In instructing the jury on the factors constituting an explosion the trial judge included the sentence, "The additional active internal force need not, however, be unusual, abnormal or suddenly produced." It is claimed this is error; but we think not. This sentence appeared in the first opinion and is a correct statement of the law. The insurance companies also contend an instruction given was prejudicially erroneous because it permitted the jury to find an explosion without finding a causal connection between the alleged elasticity of the wheat and the initial fracture. The instruction complained of was:

"If, however, you find that the wheat stored in the tank did have a modulus of elasticity and that because of the compression of the wheat there existed an active internal force in addition to that exerted by the weight and position of the wheat which additional active internal force combined with other factors to cause Tank A, to burst suddenly with noise and violence, you may find that there was an explosion of Tank A. . . ."

This sentence standing alone perhaps does not pinpoint the initial fracture, but it is not erroneous or misleading. The bursting of the tank included the initial fracture as

well as the other fractures which disintegrated the tank and in the context of this case the elasticity of wheat was tied, if only loosely, to the initial fracture. There were other instructions defining rupture and bursting as not being synonymous with explosion. If the insurance companies had requested a more definite instruction, it could have been given.

It is argued the term "modulus of elasticity" was given undue prominence in the instruction; we think not. The existence of the modulus of elasticity, or internal active force in the wheat, was a key issue. A trial court must have and does have some leeway in the choice of language and emphasis in framing instructions which as a whole must not favor one side or the other but should set forth the respective versions of the evidence of the contestants. *Webb v. Wisconsin Southern Gas Co.* (1965), 27 Wis. (2d) 343, 134 N. W. (2d) 407. The insurance companies did not object to the instruction on the grounds now urged, nor did they ask for the instruction which they now contend should have been given. The instructions they submitted to the trial court were hardly more definite. Whatever inadequacies may be ascribed to the instruction are not prejudicial.

Finally, the insurance companies argue the trial court committed prejudicial error by refusing to give the following instruction: "The proof of an internal force additional to that of the weight and position of the grain, is not an active force within the meaning of any of these instructions if the proof shows that it was only a potential force until after the Tank wall broke." The trial court refused to give this instruction because it would only have confused the jury since potential force is not defined. We think the instruction is not clear and would be unduly favorable to the insurance companies. Their theory of the case was adequately embodied in the instructions given without this dubious instruction; it was not error to refuse to give it.

*By the Court.*—Judgment affirmed.