BUEL, and others, Plaintiffs-Appellants, v. LA CROSSE TRANSIT COMPANY, Defendants-Respondents.†

*No. 75–221. Submitted on briefs March 30, 1977.—Decided May 3, 1977.*

(Also reported in 253 N. W. 2d 232.)

---

† Motion for rehearing denied, with costs, on June 22, 1977.

For the appellants the cause was submitted on the briefs of *Moen, Sheehan & Meyer, Ltd.* of La Crosse.

For the respondents the cause was submitted on the brief of *Robert D. Johns, Jr.,* and *Johns, Flaherty & Gillette, S. C.* of La Crosse.

CONNOR T. HANSEN, J. The accident occurred near the northwest corner of the "T" intersection of Elm Drive and Kenton street in the city of La Crosse, on January 14, 1971, at approximately 3:25 p.m. Elm Drive was a north-south street and Kenton street was an east-west street. Both streets were 36 feet wide and the area where the accident occured was residential.

Prior to the accident there had been a substantial amount of snowfall. Both streets were plowed out to an extent and were bordered by two to three foot high snowbanks. The streets were not fully plowed. The distance from snowbank to snowbank on Elm Drive was 30 feet and on Kenton it was 19 feet. The snow and snowbanks covered the curbs which otherwise marked the boundaries of the respective roadways. There were no sidewalks and no crosswalks at the intersection.

At the time, La Crosse Transit Company buses were being utilized to transport public school students to and from schools. The bus route, as pertains to this action, came south on Elm Drive; made a stop at or near the intersection to pick up or drop off students; then turned right and proceeded west on Kenton. At least two different buses made this route each morning and afternoon.

Buel, then twelve years old, and two friends, Kurt Papenfuss and Michael Parker, then both thirteen years old, took the first bus from school to the intersection stop. They were dropped off on the northwest corner of

the intersection; walked south across Kenton to the southwest corner; and waited a few minutes for the second bus to arrive. Their intention was to meet other neighborhood friends who they expected to be on the second bus.

The second bus, driven by defendant Shanklin came south on Elm Drive and signaled to turn west or right onto Kenton. Shanklin observed three children on the northwest corner and honked his horn at them to warn of his approach. Shanklin did not observe Buel and his two companions standing on the southwest corner. Shanklin made a partial right turn onto Kenton street, observing that Kenton was not plowed nearly as well as Elm Drive and was much narrower, and stopped to discharge his passengers in a clear area of the street. The testimony at trial was conflicting, but it appears that the bus, which was 30 feet long and 7 feet 10 inches wide, was stopped about one-half way around the turn. In this position, the front and rear of the bus were the farthest from the snowbank, with the middle of the bus being closest.

As Shanklin was discharging approximately one-half dozen students from the bus, Buel and his two companions walked back across Kenton street, directly in front of the bus; turned right at its right front corner; and proceeded to walk, single-file toward the rear door. At the time they were in close proximity to the bus, walking in the clear area between the bus and the snowbank. Shanklin did not observe the three boys walk in front of the bus, nor did he observe them walking down the right side of the bus.

The clear area between the bus and the snowbank was estimated to be anywhere between two and five feet wide at the right front corner of the bus. Because the bus was stopped approximately one-half way around the corner, the clear area narrowed until at about the middle

of the bus the snowbank was either touching the bus or about one foot away.

The boys proceeded to walk along the right side of the bus, Papenfuss in the lead, Buel in the middle, and Parker bringing up the rear. Their intention was to go to the back door and see if any of their friends got out. Because the clear area between the bus and snowbank narrowed, the boys, after a short distance, began walking up on the side of the snowbank. Buel placed his hand upon the windows of the bus as he walked to keep his balance and to keep from slipping.

Shanklin remained stopped for 15 to 20 seconds. He stated: ". . . I waited to make sure that everybody was clear of the bus, and I used both mirrors and when I saw to my satisfaction that none was near the bus I proceeded to move again." Buel was facing the bus when Shanklin started out. As the bus began to move, Buel attempted to climb backwards up the snowbank, slipped and slid under the bus. There was conflicting testimony as to whether the bus came up over the snowbank and was about to run over the area where Buel was standing, or whether the bus passed farther to the south and east, not cutting off a portion of the snowbank.

One of Buel's companions attempted to pull him out from under the bus but failed. The right rear dual wheels passed over Buel's midsection. Shanklin stopped the bus within seven to ten feet when he heard children yelling. He went back, observed Buel lying in the street and summoned aid. Buel subsequently lost 94 percent of the visual function of his left eye and underwent two surgical procedures relating to internal injuries as a result of the accident.

The theory of the plaintiffs' case is based upon the alleged negligence of Shanklin in the operation of the bus. The complaint alleges that he was negligent in the following respects; in failing to maintain a proper look-

out; in failing to properly manage and control the bus; and in making a right turn when it could not be made with reasonable safety, in violation of sec. 346.34, Stats.

The answer of the defendants denies that Shanklin was negligent in any respect and alleges that Buel was solely responsible for the incident causing his injuries in that he was negligent in the following respects; failing to maintain proper lookout; failing to position himself at a point within a marked crosswalk, in violation of sec. 346.25, Stats.; failing to maintain a position other than in a safety zone in violation of sec. 346.29; and failing to yield the right-of-way to the bus.

Before the case was submitted to the jury, and in conference with the court, both counsel agreed to the form of the special verdict. However, counsel for the plaintiffs objected to the proposed jury instructions as they related to Buel, arguing principally that they were duplicitous. The trial court determined there was no duplicity and that the instructions would be given.

The verdict of the jury found that the defendant, Shanklin, was not negligent in the operation of the bus; that the plaintiff, Jeffry Buel, was negligent with respect to his safety; and that such negligence was the cause of his injuries. The motions of the plaintiffs after verdict were denied and on motion of the defendants, judgment was entered on the verdict.

Further facts will be set forth in considering the issues presented on appeal, which are:

1. Does credible evidence support the jury verdict finding that the defendant bus driver was not negligent?

2. Did the trial court err in instructing the jury?

3. Should a new trial be granted in the interests of justice?

## SUFFICIENCY OF THE EVIDENCE.

In *Delaney v. Prudential Ins. Co.*, 29 Wis.2d 345, 349, 139 N.W.2d 48 (1966), the standard of review on appeal

from a judgment on a verdict in negligence cases was stated to be that:

". . . (1) a jury verdict will not be upset if there is any credible evidence which under any reasonable view fairly admits of an inference supporting the findings, (2) this is particularly true when the verdict has the blessing of the trial court, and (3) the evidence is to be viewed in the light most favorable to the verdict." [1]

In the instant case, the jury found Shanklin not negligent. The evidence was reviewed by the trial court and the verdict given its approval. Under these circumstances, and in accord with the authority of the above cited cases, special weight is to be given to the verdict. The question to be answered, then, is whether there is any credible evidence or permissible inferences therefrom which would support the jury verdict.

The plaintiffs contend that Shanklin was negligent both as to lookout and management and control. The plaintiffs' emphasis is upon negligent lookout. They assert that a finding of no negligence on the part of the lower court is so improbable and so contrary to the weight of the evidence so as to warrant a new trial. Our attention is directed to evidence which they believe constitutes negligence on the part of Shanklin. Those facts, if relied upon by the jury, might have supported a finding of negligence on the part of Shanklin. The question is not, however, whether credible evidence would support such a finding of negligence, but whether any credible

[1] *See also: Sabinasz v. Milwaukee & Suburban Tr. Corp.,* 71 Wis.2d 218, 222, 223, 238 N.W.2d 99 (1976); *Victorson v. Milwaukee & Suburban Transport Corp.,* 70 Wis.2d 336, 348, 234 N.W.2d 332 (1975); *Knox v. American Standard Ins. Co.,* 64 Wis. 2d 229, 230, 231, 219 N.W.2d 333 (1974); *Capello v. Janeczko,* 47 Wis.2d 76, 81, 176 N.W.2d 395 (1970); *Hillstead v. Smith,* 44 Wis.2d 560, 566, 177 N.W.2d 315 (1969); *Cornwell v. Rohrer,* 38 Wis.2d 252, 257, 156 N.W.2d 378 (1968).

evidence supports the finding of no negligence, which the jury did in fact make.

There was no evidence of record to indicate that Shanklin at any time lost physical management and control of the bus. There was no indication of excess speed or any skidding or sliding off of the roadway. The plaintiffs necessarily center their management and control argument on the fact that Shanklin may have driven the bus off of the cleared portion of the roadway and onto or into one of the snowbanks bordering the cleared portion.

There was testimony elicited from several witnesses which indicated that as the bus began to move it cut off part of the snowbank upon which Buel was standing. Those witnesses testified that had Buel not moved he would have been hit by the bus. They further indicated that Buel slipped while he was back-stepping and when the snowbank began to cave in as a result of the bus movement.

The testimony was not uncontroverted, however. Witness David Bakken testified that Buel fell or slipped as he cocked his arm to throw a snowball before the bus started to move, and that it looked like the snowbank caved in. Shanklin, himself, testified that he felt no bumps or motions as would indicate that he had run over a snowbank. He further testified that upon going back to the scene after he stopped the bus he observed that the bus tracks were approximately one foot away from the snowbank.

Shanklin's testimony in particular was neither incredible nor inherently untrustworthy. The jury was not required to believe the testimony of the other witnesses and to discredit his. This court has long held that the credibility of witnesses and the weight to be given their testimony are matters for the jury. *Lutz v. Shelby Mut.*

*Ins. Co.,* 70 Wis.2d 743, 756, 757, 235 N.W.2d 426 (1975).[2]

■

If the jury did believe Shanklin, which it was entitled to do, it could have determined that the bus at all times traveled on the open area of the roadway. Thus the basic premise upon which the plaintiffs grounded their lack of management and control argument would be non-existent and no negligence in that area would attach. Given the testimony of Shanklin, there was ample credible evidence in the record to support the verdict of no negligence on the part of Shanklin as to management and control.

In considering the element of lookout, certain facts appear undisputed. Shanklin had stopped the school bus and was occupied in discharging his student passengers from both the front and rear doors of the bus. He did not observe Buel and his two companions cross in front of the bus and did not observe Buel on the right side of the bus between the front and rear bus doors. The ultimate question is not, however, what Shanklin saw or did not see, but whether he exercised the proper degree of care insofar as lookout is concerned.

■

Shanklin testified that after the stop, ". . . I waited to make sure that everybody was clear of the bus, and I used both mirrors and when I saw to my satisfaction that none was near the bus I proceeded to move again . . . I checked to see that everybody was clear, and then I started to move ahead again." Shanklin was speaking of observing the one-half dozen or so passengers whom he had just discharged. He was thus himself engaged in the discharge of the duty he owed to his pas-

[2] *See also: Valiga v. National Food Co.,* 58 Wis.2d 232, 244, 206 N.W.2d 377 (1973); *Milbauer v. Transport Employes' Mut. Benefit Society,* 56 Wis.2d 860, 867, 203 N.W.2d 135 (1973); *Babler v. Roelli,* 39 Wis.2d 566, 575, 159 N.W.2d 694 (1968).

sengers to provide a place of safety to alight and to refrain from any conduct in the operation of his vehicle which would convert the place of safety to one of potential hazard. *Gustavson v. Milwaukee & Suburban Transport Corp.*, 52 Wis.2d 510, 191 N.W.2d 39 (1971); *Furrer v. Milwaukee & Suburban Transp. Corp.*, 40 Wis. 2d 560, 162 N.W.2d 537 (1968); *Williams v. Milwaukee & Suburban Transport Corp.*, 37 Wis.2d 402, 155 N.W.2d 100 (1967).

That duty is a somewhat limited one, however, as stated in *Victorson, supra,* 353:

"A duty to observe that alighting passengers have cleared the zone of danger created by further movements of the bus does not impose a duty inconsistent with the responsibility of forward view for traffic purposes; rather, it comes into play and is completed before that duty arises. Additionally, the duty is to alighting passengers, and does not command continual rear view to observe pedestrians or, as perhaps in the case of *Gustavson,* passengers who have cleared the danger zone but who re-enter through their own subsequent independent acts of negligence."

Buel was a pedestrian and not one of the defendant-Shanklin's passengers.

The plaintiffs contend that a blind spot was created along the right side of the bus because of the lack of an outside right mirror and that Shanklin had an obligation to get out of his seat and inspect the area immediately adjacent to the right side of the bus prior to moving.

There is little doubt that a blind spot did exist in that area. But Shanklin had discharged his duty to his alighting passengers. He had ascertained to his satisfaction that they had safely moved away from the bus, and had done so without finding it necessary to observe the blind spot area. A reasonable inference is that this was so because all of the discharged passengers walked safely away from the bus. Before a duty arose requiring

Shanklin to actually get out of the driver's seat and place himself in a position where he could observe the area outside the bus which he could not see from the mirrors, he must have had some reason to anticipate the presence of a pedestrian in this blind spot area.

Under the circumstances presented in this case the jury could reasonably conclude that Shanklin had exercised ordinary care as to lookout in that he had utilized all means available to him to observe the area surrounding the bus and that he had no reason to believe that anyone was in the blind spot area. The fact that he did not observe Buel cross in front of the bus and enter the blind area when his attention was properly directed to his alighting passengers cannot here give rise to a duty to get out of his seat and observe the blind area.

In *Grube v. Moths,* 56 Wis.2d 424, 433, 202 N.W.2d 261 (1972), this court stated:

"The duty to use due care arises from probabilities, rather than from bare possibilities of injury. Failure to guard against the bare possibility of injury is not actionable negligence. *Olsen v. Milwaukee Waste Paper Co.* (1967), 36 Wis.2d 1, 153 N.W.2d 45; *Meihost v. Meihost* (1966), 29 Wis.2d 537, 139 N.W.2d 116; *Lee v. Milwaukee Gas Light Co.* (1963), 20 Wis.2d 333, 122 N.W.2d 374.

"Under the circumstances of this case, it would appear that the defendant had no reason to anticipate that Randall [the injured party] was, or was likely to be, to the rear of his truck as he proceeded to complete his 'Y' turn. The presence of Randall was a mere possibility from which arose no duty to get out of the truck and investigate."

The same considerations are relevant here where there was only a possibility and not a probability that persons would enter the blind area while Shanklin's attention was properly directed elsewhere.

The jury, having been properly instructed as to the lookout duty owed by Shanklin, concluded that he had exercised reasonable care in discharging that duty. Under these circumstances and based upon this record, we cannot hold as a matter of law that Shanklin was negligent as to lookout.

## INSTRUCTIONS.

There is a conflict in the evidence as to the conduct of Buel at and immediately prior to the accident. The plaintiffs objected to the instructions on the grounds that, as to Buel, there was no evidence to support the facts upon which they were predicated and that the instructions were duplicitous.

We have examined the entire instructions given and believe that they were based upon evidence of record, were non-duplicitous, properly stated the law, and did not constitute prejudicial error. The trial judge has great leeway in framing instructions. The choice of language and emphasis as a whole must not favor one side or the other and should set forth the respective versions of the evidence of the respective parties. *Carlson v. Drews of Hales Corners, Inc.*, 48 Wis.2d 408, 180 N.W.2d 546 (1970); *Aetna Casualty & Surety Co. v. Osborne-McMillan Elevator Co.*, 35 Wis.2d 517, 529, 151 N.W.2d 113 (1967); *Webb v. Wisconsin Southern Gas Co.*, 27 Wis.2d 343, 350, 134 N.W.2d 407 (1965). Where necessary and desirable, instructions should be tailored to meet the needs of the specific case. *Leibl v. St. Mary's Hospital of Milwaukee*, 57 Wis.2d 227, 233, 203 N.W.2d 715 (1973). In the case before us the instructions as to Jeffry Buel were to some extent unnecessarily personalized. "Even though not erroneous, personalized instructions are not favored." *Young v. Anaconda American Brass Co.*, 43 Wis.2d 36, 56, 168 N.W.2d 112 (1969).

Furthermore, the alleged errors in regard to the trial court's instructions concerned the standard of care applicable to Buel. A similar situation was presented in *Gile v. Widholm*, 17 Wis.2d 275, 116 N.W.2d 249 (1962). Therein the defendant had struck the plaintiff with her automobile. The jury found the defendant to be free of negligence, but found the plaintiff causally negligent. The plaintiff on appeal raised an alleged error in regard to the trial court's instructions which concerned the standard of care applicable to the plaintiff. This court stated at pp. 279, 280:

"We find it unnecessary to pass on this alleged error. This is because the jury absolved Mrs. Widholm of all negligence. It is not claimed that the instructions were too favorable to her, but rather that they were unfavorable to the minor plaintiff. However, unless some negligence could be established against Mrs. Widholm it is immaterial whether the boy was found guilty of negligence."

Therefore, we find it unnecessary to further consider this alleged error. This is because the jury absolved Shanklin of all negligence. It is not claimed that the instructions were favorable to Shanklin, but rather that they were unfavorable to Buel. Jury instructions are viewed in their entirety. In *Bohlman v. American Family Mut. Ins. Co.*, 61 Wis.2d 718, 726, 214 N.W.2d 52 (1974), we said:

". . . In determining the effect of an instruction on the validity of a verdict, the well-established principle is that a single instruction to a jury may not be judged in isolation but must be viewed in the context of the overall charge. . . ."

Unless some negligence was established as to Shanklin, it is immaterial whether the boy was found guilty of negligence. The jury was adequately and properly in-

structed as to the standards of care applicable to both Shanklin and Buel.

## INTERESTS OF JUSTICE.

We are asked to exercise our discretion under sec. 251.09, Stats., and grant a new trial in the interests of justice. It is argued that there was a probable miscarriage of justice and that a new trial would probably effect a different result and that the real controversy has not been fully tried.

In *Benzschawel v. Stoll*, 64 Wis.2d 211, 214, 215, 218 N.W.2d 748 (1974), this court again restated the test for granting a new trial under sec. 251.09, Stats.:

". . . The test of granting a new trial in the interests of justice is whether this court is convinced that there was a probable miscarriage of justice. In viewing the case as a whole, this court must be convinced to a reasonable certitude that if there were a new trial it would probably effect a different result. *Lock v. State* (1966), 31 Wis.2d 110, 142 N.W.2d 183; *Bohlman v. American Family Mut. Ins. Co.* (1974), 61 Wis.2d 718, 214 N.W.2d 52; *Savina v. Wisconsin Gas Co.* (1967), 36 Wis.2d 694, 154 N.W.2d 237. And, this does not mean that this court might think if a different jury would have decided the case, a different result would have been effected. The grounds asserted for a new trial here, if eliminated in a new trial, must have the reasonable probability of effecting a different result. . . ."[3]

The plaintiffs contend that the finding of no negligence on the part of Shanklin was so improbable as to warrant a new trial and that a new trial will reach a different result, at least insofar as it will result in a comparison of negligence between the parties.

[3] *See also: Stevens Const. Corp. v. Fisher*, 76 Wis.2d 179, 183, 251 N.W.2d 22 (1977); *Young v. Board of Ed., Joint Dist. No. 10*, 74 Wis.2d 144, 152, 153, 246 N.W.2d 230 (1976); *Billingsley v. Zickert*, 72 Wis.2d 156, 168, 240 N.W.2d 375 (1976); *Lorenz v. Wolff*, 45 Wis.2d 407, 414, 173 N.W.2d 129 (1970).

Since we have determined there was credible evidence to sustain the finding of the jury of no negligence as to Shanklin, it cannot now be said that justice has miscarried and that a new trial would result in a recovery for the plaintiffs. *Lorenz, supra,* 414; *Savina v. Wisconsin Gas Co.,* 36 Wis.2d 694, 704, 154 N.W.2d 237 (1967). Under these circumstances the mere fact that comparison of negligence was not accomplished has no bearing. *See: Schrank v. Allstate Ins. Co.,* 50 Wis.2d 247, 261, 184 N.W.2d 127 (1971).

In order to achieve a different result in this case, it would be necessary to establish negligence of Shanklin that was greater than that of Buel.[4] Under these facts and on this record it cannot be said a new trial would probably reach that result.

In their reply brief, the plaintiffs advance for the first time the issue of the lack of an exterior right side mirror on the bus. The plaintiffs contend that a new trial would permit the jury to also consider the absence of such a right exterior mirror; and that absent consideration of this issue, the real controversy has not been fully tried.

We are of the opinion that the time has passed when the issue of the absence of the right exterior mirror can be litigated. Although evidence was introduced concerning the absence of such mirror, no special verdict question was requested by the plaintiffs on this issue. No attempt was made to charge negligence on the part of the defendant bus company for the failure to provide such a mirror. The case was tried on the theory of the negligent operation of the bus by Shanklin. On appeal, under the circumstances, the issue in regard to the absence of such mirror or the absence of a special verdict question on the issue cannot be raised as an alleged error. *Williams,*

[4] This accident occurred on January 14, 1971, before sec. 895.045, Stats., was amended.

*supra,* 410; *Van Wie v. Hill,* 15 Wis.2d 98, 105, 106, 112 N.W.2d 168 (1961); *Scalzo v. Marsh,* 13 Wis.2d 126, 141, 108 N.W.2d 163 (1961).

Although the plaintiffs do not actually allege trial court error on this issue, they argue for a new trial on an issue which was not raised at trial. A similar position was advanced by a plaintiff in *John Mohr & Sons, Inc. v. Jahnke,* 55 Wis.2d 402, 198 N.W.2d 363 (1972). There the plaintiff had proceeded on its claim under the language of an existing contract. Upon losing on the merits the plaintiff contended that a new trial should be granted to try the real controversy between the parties upon a new theory based upon "shop rights." This court disagreed, stating at page 408:

". . . Since the plaintiff chose to pursue its claim on the language of the contract, we do not think it ought now be permitted to change the theory of its case to one of shop rights. Sec. 251.09, granting this court the power of discretionary reversal, was not intended to allow plaintiff to proceed to a trial on a valid theory of a cause of action and, losing on that theory, to have a second trial on a different, valid theory of a cause of action. When there are alternative causes of action and one makes a choice, there is little room for arguing the real issue has not been tried."

As in *John Mohr & Sons, Inc. v. Jahnke, supra,* the real issue, as presented by the plaintiffs, has been fully tried.

This court has on occasion exercised its discretion under sec. 251.09, Stats., to grant a new trial where the real controversy has not been fully tried. *Merco Distrib. Corp. v. O. & R. Engines, Inc.,* 71 Wis.2d 792, 798, 239 N.W.2d 97 (1976). However, this is not such a case. The issue of the negligent operation of the bus by the driver-Shanklin was fully tried. Adequate instructions were given and the proper law applied. There was cred-

ible evidence to support the finding of the jury. The plaintiffs were not successful, but because one is not successful on the merits under a chosen theory is not to say that the real controversy has not been fully and fairly tried.

By the Court.—Judgment affirmed.