Scalzo, Appellant, v. Marsh, d/b/a Spooner Electric Service, and another, Respondents.

*February 9—March 7, 1961.*

130

For the appellant there was a brief by *Douglas, Omernik & Bitney* of Spooner, and oral argument by *E. E. Omernik*.

For the respondent Don Marsh there was a brief by *Cameron, Cameron & Shervey* of Rice Lake, and oral argument by *William A. Cameron*.

For the respondent Skelly Oil Company there was a brief by *Hughes, Anderson & Davis* of Superior, and *Sam C. Oliver* of Tulsa, Oklahoma, and oral argument by *J. L. Davis* and by *Harold Witkin* of Superior.

CURRIE, J.   The issues on this appeal are:

(1)  Should either or both of the jury's answers of "No" to the first two questions of the special verdict have been changed to "Yes" by the trial court?

(2)  Did the trial court commit prejudicial error in instructing the jury?

(3)  Should a new trial be granted in order to have determined the issue of whether "continued servicing" of

the gas system constituted a violation of the liquefied petroleum gases code?

(4) Should a new trial be granted in the interest of justice?

(5) Was it error to have granted the directed verdict in favor of Skelly Oil Company?

### Changing of Jury's Answers.

Counsel for Scalzo contend that there was no credible evidence to support the jury's answers of "No" to the first two questions of the special verdict, and, therefore, the trial court should have granted the motion after verdict to change such answers to "Yes." These questions inquired whether Spooner Electric Service installed the burner and accessory equipment in the Scalzo smokehouse in January, 1948, and in the fall of 1949.

Originally the basement smokehouse was constructed of masonite. A fire took place there in the summer or early fall of 1949. After such fire Scalzo replaced the masonite smokehouse with a new one constructed of concrete blocks having a false, poured, concrete ceiling, which construction was completed in the fall of 1949. There is some doubt cast by the testimony as to whether the gas burner and accessory equipment in this second smokehouse was the same as in the first one. However, Scalzo testified that he thought it was. No change was made in such burner and accessory equipment between the installation in the fall of 1949 and the explosion nine years later in 1958.

The replaceable cylinders containing Skelgas which was burned in the smokehouse were located outside the building. The gas was led through metal tubing from these cylinders into the basement at a point not immediately adjacent to the smoke room. This line of tubing ended at a manually operated shutoff valve having a white porcelain handle, which valve was located near the floor and adjacent to one of

the concrete-block walls of the smoke room. From such shutoff valve the gas passed into a venturi tube which protruded through a small hole in such wall. The flared end of the venturi tube was located adjacent to the shutoff valve and fresh air from the basement was drawn into the venturi tube in order to provide a mixture of air and gas to be fed to the burner. The small end of the venturi tube, which protruded into the smoke room, was welded to a short line of pipe leading to the burner. The burner was a short length of pipe forming a T joint with such line of pipe. The burner had 62 small holes through which the gas passed and was ignited when the burner was in operation. A rectangular steel plate approximately two by three feet in size had been placed over such burner by Scalzo in a horizontal position so that the plane of such plate was parallel to the basement floor. Such plate at the time of the explosion was supported at three corners by short metal legs, and the fourth corner by a coffee can. The reason such steel plate had been placed over the burner was to keep the flames from the burner from shooting up into the air. The procedure followed by Scalzo in lighting the burner was to place a burning newspaper on the burner and then go out into the basement and open the shutoff valve so that gas would pass out through the holes of the burner and be ignited.

On January 24, 1947, Marsh and his then partner, W. A. Lewis, purchased a going business at Spooner from one Booth. Such business consisted of doing electrical wiring, repair work, making electrical installations, and selling appliances. It was conducted by Marsh and Lewis under the trade name of Spooner Electric Service. They did not handle liquefied petroleum gas until August, 1947, when they took on from the Skelly Oil Company the distributorship of Skelgas. Lewis handled the gas end of the business while Marsh confined his efforts to the electrical end.

On January 7, 1948, a written lease was entered into between Skelly Oil Company and Scalzo whereby the former leased to the latter a regulator, including automatic change-over equipment, such regulator being described by serial number. The purpose of such regulator is to keep the gas pressure, as it is fed into the system from the cylinders, at a steady, fixed pressure. Such lease also provided that the leased equipment together with the cylinders containing Skelgas to be supplied to Scalzo from time to time should remain the property of Skelly Oil Company. On the same day Spooner Electric Service installed such leased equipment on the outside of Scalzo's building and provided a concrete slab on which two gas cylinders were to be placed when connected up with the regulator. A detailed invoice was rendered by Spooner Electric to Scalzo for the labor and materials furnished in making such installation. The labor and materials listed were as follows:

Elect. 2 hrs. @ 1.50...................... 3.00
Elect. 1½ hrs. @ 1.75.................... 2.63
1½'–1" copper tubing @ .21.............. .32
1–¾" St. Ell.......................... .35
1–¾" Bushing......................... .16
1–1½" half union...................... .46
1–1½" union.......................... .54
3–½" flare nuts........................ .26
1–concrete slab........................ 2.00

A copy of such invoice is the only written record in this case of Spooner Electric Service's having made any installation of any gas equipment, tubing, or appliances on the Scalzo premises.

Scalzo's testimony with respect to the installation of that part of the gas system located inside the building is as follows: Spooner Electric Service installed the burner and accessory equipment in the original masonite smoke room, and he remembered Lewis' being there at the time. About 25

feet of tubing were required for the installation. As a result of heat, strings holding up hams in the smoke room burned, causing the hams to fall on top of the hot rectangular steel plate over the burner, and such hams commenced to burn. Fat from this went into the burner plugging it up and putting out the gas flame. Spooner Electric Service removed the burner and took it to their shop to clean it. After the new smoke room was constructed, Spooner Electric Service brought back the burner and reinstalled it. Scalzo was unable to produce records of any kind showing payment to Spooner Electric Service for any labor or materials furnished in making either of the two installations inside the building.

One Metzler testified as follows: He is now a railroad brakeman and conductor residing at Altoona, Wisconsin, but lived in Spooner in 1948 and for some years thereafter. In 1949 he was employed by Scalzo on an hourly wage basis to construct the new smoke room. Wisner, an employee of Spooner Electric Service, made the hole in the east wall of the smoke room near the floor through which the venturi tube of the gas system was inserted. Wisner then installed the burner, and was only there from one to one and a half hours. Lewis came also but did not stay. The line of tubing extending to the smoke room from the outside regulator and cylinders was already there when Wisner installed the burner. Metzler was not on the premises when the original installation was made in the prior smoke room. He was paid $187 by Scalzo for his labor on September 14, 1949, and the further sum of $48 on November 15, 1949.

Wisner testified as follows: He had first been employed by Booth and then by Spooner Electric Service. He assembled the shutoff valve and pipe fittings at the Spooner Electric Service shop from an old gas stove and installed the same together with the burner in the new smoke room. The hole in the east wall of the smoke room was made by him. When he installed the burner, Lewis and Scalzo were there

part of the time. Wisner had no recollection of working inside of Scalzo's building when the original masonite smokehouse was there. He could not recall whether he brought the burner from the shop at the time he brought the valve and fittings but knew "we" had it there up at the shop once. He told Scalzo that, if the fire in the burner ever went out, to turn off the gas and air out the room before attempting to relight the burner. Except for the valve and the orifice (the short length of pipe leading into the venturi tube), the other pipe, nipples, and fixtures were all new and a charge would be made by Spooner Electric Service for the same. It was his duty to keep in writing a detailed account of his labor and all materials used on a job and to turn the same in to his employer daily, and he did so. Wisner was discharged by Marsh after the death of Lewis in 1952.

Marsh testified as follows: After Spooner Electric Service had been operating a couple of months in 1947, a certified public accountant was engaged who installed a system of keeping records and books, which system was continued down to the date of trial. Under such system the employee would keep a record of the time spent on any piece of work and of the material used. Upon his return to the shop this information would be turned over to the bookkeeper who would transfer the information there contained to an invoice. The employee was required to account for each of the hours in the day and this information was kept by Spooner Electric Service until the bill was paid, after which it was destroyed and the only record would be the total hours involved and the material used as shown by the duplicate copies of the invoices furnished the customer. The customer would be billed on an invoice and a duplicate copy of the invoice kept indefinitely. Because the liquefied-petroleum-gas department was operated under the direct supervision of Lewis, Marsh had no personal knowledge of the operations of such department prior to Lewis' death except as shown by the books and records of the

partnership. Marsh produced all duplicate invoices covering any work or material supplied to Scalzo, and, outside of invoices for cylinders of gas, the only one covering any labor or materials for gas installations or repairs was that for the installing of the automatic regulator and accessory equipment on the outside of the building on January 7, 1948. There was no other record of Spooner Electric Service showing any other charge made to Scalzo for gas-installation labor or materials except this afore-described duplicate invoice. There was a detailed duplicate invoice for electrical work done for Scalzo on September 5, 1947.

The crucial question, in passing on the issue of whether the answers "No" to the first two questions of the special verdict should have been changed to "Yes," is whether the negative evidence, that the books and records of Spooner Electric Service showed no charge for any labor or material for any installation made of the burner and accessory gas equipment located inside the building, was sufficient to make such issue one of fact for the jury. The general rule is that the weight to be accorded negative evidence is for the jury to determine. *Conrardy v. Sheboygan County* (1956), 273 Wis. 78, 82, 76 N. W. (2d) 560; 2 Wigmore, Evidence (3d ed.), p. 777 *et seq.*, sec. 664; comment note, Distinction between positive and negative evidence, 140 A. L. R. 530, 531. When the negative evidence is the absence of entries in books and records of account, 5 Wigmore, Evidence (3d ed.), pp. 392, 393, sec. 1531, states:

"The *absence of an entry*, where an entry would naturally have been made if a transaction had occurred, should ordinarily be equivalent to an assertion that no such transaction occurred, and therefore should be admissible in evidence for that purpose. The same question arises for other kinds of evidence (post, secs. 1556, 1639).

"The contrary attitude of some courts is lamentable. When a book purports to contain all items transacted within the

scope of the book's subject, the absence of an entry of trans-action of a specific purport is in plain implication a state-ment by the maker of the book that no such transaction was had. The psychology of it is the same as that of testimony on the stand by a person who denies that a sound took place in his presence because he heard no such sound (ante, sec. 664). The practical reliability of it is shown by every day's practice in every business house. All industry and commerce is daily conducted on the negative as well as on the affirmative showings of the regular books of entry."

Counsel for Scalzo cite *Winner v. Bauman* (1871), 28 Wis. 563, as supporting their contention, that the absence of any entry in Spooner Electric Service's books and records of account showing a charge for labor and materials in making the installations in question for Scalzo, is not probative evidence that such installations were not made by it. In such case there was an issue as to how much goods the defendant had purchased from the plaintiffs. The defendant introduced his books of account in evidence to show how much goods he had purchased from the plaintiffs. The statute pursuant to which such books were introduced was ch. 137, sec. 88, R. S. 1858, predecessor to sec. 327.24, Stats.[1] The defendant made the oath required by ch. 137,

---

[1] Ch. 137, sec. 88, R. S. 1858, read as follows:

"Whenever a party in any cause or proceeding shall produce at the trial his account books, and swear that the same are his account books kept for that purpose; that they contain the original entries of charges for goods or other articles delivered, or work and labor or other services performed, or materials found, and that such entries are just to the best of his knowledge and belief; that said entries are in his own handwriting, and that they were made at or about the time said goods or other articles were delivered, said work and labor or other services were performed, or said materials were found— the party offering such book or books as evidence, being subject to all the rules of cross-examination by the adverse party that would be applicable by the rules to any other witness giving testimony re-lating to said book or books—if it shall appear upon the examination of said party that all of the interrogations in this section contained

sec. 88, R. S. 1858, to authorize the admission in evidence of such account books, and such books purported to contain the account of all goods purchased of the plaintiffs. The court held that the entries of such purchase were (p. 566), "not evidence that the defendant purchased no other goods of the plaintiffs."

Not only is present sec. 327.24, Stats., much broader in scope than ch. 137, sec. 88, R. S. 1858, but in the instant case we have the testimony of Marsh, corroborated to some extent by Wisner, as to Spooner Electric Service's system of accounting and keeping records under which there would

are satisfactorily established in the affirmative, then the said book or books shall be received as *prima facie* evidence in proof of the charges therein contained."

Sec. 327.24, Stats., now reads as follows:

"Whenever a party in any action or proceeding shall produce at the trial his account books, and prove that the same are his account books kept in due course of his business, that they contain the original entries for moneys, paid or received, property delivered or furnished or services performed; that such entries were made contemporaneously with the transactions therein entered; that they are in his handwriting or that of a person or persons authorized to make charges or give credits in said books, and are just and true to the best knowledge and belief of the person making the proof, such books shall be received as *prima facie* evidence of the entries contained therein. If any book has marks which show that the entries have been transferred to a ledger, the entries shall not be received unless the ledger is produced, or its nonproduction is excused by the court. The entry of charges or credits, involving money, property, or services furnished or received, when the furnishing or receipt thereof constitutes a part of the usual course of business of the person on whose behalf such entry is made, shall be received as *prima facie* evidence of the furnishing or receiving of such moneys, property, or services, whether the same be contained in an account book, or in a loose leaf, card, or similar system of keeping accounts, and whether the same be made by handwriting, typewriting, or similar means, if it shall appear that such entry was made by a duly authorized person or persons contemporaneously with the transaction therein referred to, as a part of the general system of accounts of the person on whose behalf the entry is made, and that the same is made in the usual and ordinary course of said business."

have had to have been a record made of all labor and new material used in making the Scalzo installations, if it had made the same. It is true that sec. 327.24 only speaks of records of account constituting *prima facie* evidence of the furnishing or receiving of the moneys, property, or services. However, we do not interpret such statute as restricting the power of this court to permit triers of fact from drawing a reasonable inference from the absence of any entries in such records of account kept in the usual course of business.

It is our considered judgment that the established absence of any record in Spooner Electric Service's books of account, which showed the furnishing of any materials or labor for the installation in question, was sufficient to make the question of whether Spooner Electric Service made either or both of such installations a jury issue.

Furthermore, we deem it entirely immaterial to the ultimate question of liability on the part of Marsh whether Spooner Electric Service made any installation of the burner and accessory equipment prior to May 4, 1948. This is because the liquefied petroleum gases code first went into effect on May 4, 1948. Scalzo put in no evidence to prove that the installation of the burner and accessories in the original masonite smokehouse failed to meet customary standards in the industry. He did call as an expert witness, I. F. Statz, supervisor of fire prevention for the Wisconsin industrial commission.

Statz testified that the installation of the burner and accessory equipment at the time of the 1958 explosion failed to comply with the provisions of the afore-mentioned code in the following respects: The installed gas system, including the burner, was required to be tested and listed by a recognized testing laboratory, or inspected and approved by the industrial commission, which was not done; no automatic shutoff valve was provided to shut off the gas in the event

the burner flame was extinguished; and the shutoff valve which was installed was placed too close to the floor where it was likely to be turned on by accident. All of this testimony is only relevant with respect to the installation made in the fall of 1949 after the code was in effect.

*Instructions to the Jury.*

In that part of the instructions to the jury, which related to the question of the verdict dealing with Scalzo's contributory negligence, the trial court charged:

"You are instructed that Dom Scalzo was the owner of the burner and accessories in and about the smokehouse and it was under his control. It was his duty to maintain, inspect, and repair the same at all times and to maintain it in a safe condition so as to avoid injury."

While such instruction was given in reference to the question of contributory negligence, it is contended by counsel for Scalzo that it might have affected the jury's answers to the first two questions of the verdict. It is urged that it was prejudicial error to instruct that Scalzo was the owner of the burner and accessories because there was no testimony given to such effect. However, neither was there any evidence that such burner and accessories were owned by anyone else. It is plain from reading the instructions as a whole that the words "and accessories" only referred to that part of the gas system located inside of Scalzo's building. The Skelly Oil Company lease only covered the automatic regulator and accessories located on the outside of the building.

On this state of the record there can be no question but that the burner and remaining portion of the gas system located within the building owned by Scalzo also constituted his property. Such gas system was a permanent installation necessary to the operation of the smokehouse. It, therefore, constituted a fixture appertaining to the real estate, and its title was in Scalzo as owner of the real estate. *Leisle v.*

*Welfare Building & Loan Asso.* (1939), 232 Wis. 440, 444, 445, 287 N. W. 739. The tendency is to regard everything as a fixture which is necessary to the operation of a plant. 22 Am. Jur., Fixtures, p. 718, sec. 5.

We find no error in the instruction given.

### Continued Servicing of the Gas System.

The brief filed in behalf of Scalzo asserts that the "continued servicing" of the gas system in Scalzo's building constituted a violation of the liquefied petroleum gases code, and that the trial court should have so determined. As evidence that Spooner Electric Service did service such gas system, counsel directs our attention to defendants' Exhibit M. Such exhibit is a record showing the numerous cylinders of Skelgas which Spooner Electric Service "installed" at the locker plant commencing January 7, 1948, and ending August 19, 1958. There is no evidence that Spooner Electric Service made any repairs to the system or burner located inside of Scalzo's building subsequent to the installation of the burner in the new smokehouse in the fall of 1949.

Inasmuch as counsel for Scalzo did not request a question to be included in the special verdict on this issue, of continued servicing, Scalzo cannot raise the same as a matter of right on this appeal. *Lind v. Lund* (1954), 266 Wis. 232, 237, 63 N. W. (2d) 313, and *Nimits v. Motor Transport Co.* (1948), 253 Wis. 362, 364, 34 N. W. (2d) 116. However, we deem it advisable to comment on the evidence bearing on such question of "continued servicing." This is because it has some materiality with respect to whether we on our own motion should grant a new trial in the interest of justice.

The only provision in the liquefied petroleum gases code of 1948 on such issue of servicing, that we have been able to discover, is found in that portion of Order 900 A of the code which reads as follows:

"This code shall apply to plants, stores, equipment, and installations storing, handling and/or using liquefied petroleum gas; to reconstructions, alterations, and extensions; to existing plants, stores, equipment, and installations which may constitute a life or fire hazard, except in so far as on special applications, the industrial commission shall waive strict compliance when in its opinion the requirements of this code cannot be reasonably fulfilled.

"(a) The following standards are intended to apply to the design, construction, location, installation, and operation of liquefied petroleum gas systems."

Counsel ground their contention, that the continued servicing of the system constituted a violation, upon testimony given by the witness Statz. On direct examination, Statz related how the interior gas system violated the code provisions. In the midst of his testimony while so doing he stated:

"I also maintain that the entire system, and the continued servicing of this system, was a violation of *the orders as mentioned.*" (Emphasis supplied.)

We find such reference to *"the orders as mentioned"* baffling because none of the orders of the code, which were previously listed by Statz in his testimony, make any reference to "servicing."

On cross-examination, Statz was asked these questions and gave these answers thereto:

"*Q.* Mr. Statz, is there anything in the code requiring a distributor, in installing those bottles and regulators, to inspect the customer's equipment to see that it complies with your rules? *A.* At the original time of the installation, Yes, sir.

"*Q.* And if the installation is already there when he gets there, then, I take it, there is no requirement that he inspect the equipment? *A.* I would like to tell you the original procedures, but as far as the code requires, there is not a requirement whereby they inspect the appliances and other parts of the installation at each change of container. However,

the procedure is, by all reputable dealers, that they determine if any valves are open before they make the installation or change-over.

"*Q*. But in answer to my question, it is true that the code does not require a distributor, in hooking up the—or in placing the installation on the outside of the house where the inside has already been serviced, to make any inspection of that equipment inside of the building? *A*. No. There is no basic rule."

The "original time of the installation" mentioned by the witness refers to the installation of the automatic regulator on its standard with its "pigtail" accessories for connecting onto the gas cylinders. This installation took place January 7, 1948, before the code was promulgated. The above-quoted testimony makes it abundantly clear that on such occasions when Spooner Electric Service changed the cylinders there was no code requirement that it go inside the building and inspect the interior gas system or any accessories connected thereto, or which prohibited it from making such change-overs of cylinders.

*New Trial in the Interest of Justice.*

In behalf of Scalzo it is also urged that the trial court abused its discretion in failing to order a new trial.

One of the grounds advanced in support of such contention is that there was no credible evidence to sustain the jury's answer of "No" to the first two questions of the special verdict. However, we have determined that there was credible evidence to support such answers. While the court in its discretion could have granted a new trial because it considered such answers to be opposed to the greater weight of the evidence, there was no abuse of discretion in failing to do so.

The additional reason, which is asserted in support of the contention that there was an abuse of discretion in not granting a new trial in the interest of justice, is that justice

probably miscarried because of a colloquy which took place between the court and jury. This took place when, after deliberating for some time, the jury returned to the court-room for further instructions. We quote from the record as follows:

"Forewoman Lewis: When we come to question 9 [the comparative-negligence question], we feel that if we answer 1 and 2, 'No,' we still feel that there was some negligence because of the tank installation on the outside because in the code, it said that it was that an inspection should be made, or something to that effect, of the installation inside. We feel that hooking up to the installation already in there, made the Spooner Electric somewhat negligent, but there is no question, in these questions, that would apply to that."

The court then told the jury that if they answered questions 1 and 2 "No," they were not required to answer question 9, but should answer question 10 which related to damages. Then the following ensued:

"Forewoman Lewis: I believe there was no question as to whether Spooner Electric installed the tanks on the outside fixtures.
"The Court: No dispute about that.
"Forewoman Lewis: No dispute about that, but the fact that they hooked them up to this other system is what we think is not—or that they continued to furnish gas at all under these conditions—.
"The Court: Well, of course, the trouble is, you are raising an issue that really wasn't litigated on the trial. The theory of the trial was that the Spooner Electric Company installed, not only the tanks, but the burners and that they were negligent in installing the burners.
"Forewoman Lewis: Yes.
"The Court: So—
"Forewoman Lewis: Whether they were negligent in another respect is not covered, is that it?
"The Court: Wasn't tried out.
"Forewoman Lewis: It isn't covered by this code?

"The Court: Well, that code is a pretty complicated deal. I am frank to say, I don't know whether it is or not. . . .

"The Court: That is, the witnesses, or the attorneys didn't go into anything about the approval—

"Forewoman Lewis: Mr. Statz's testimony, I think, brought forth this other portion [of the code].

"The Court: Yes. Well, that is all the help I can give you. I can't change the questions now, or add a queston. I see your problem, so you probably will just have to go in and answer the questions as best you can.

"Forewoman Lewis: We don't answer question 9 if we answered 1 and 2, 'No?'

"The Court: You don't answer that question unless you find both parties negligent, but you have to answer the last question.

"Forewoman Lewis: Yes. Thank you."

Apparently from the foregoing, the jurors had interpreted Statz's testimony as meaning that Spooner Electric Service violated the code when in January, 1948, the original installation was made of the leased regulator and accessory equipment, and when it connected up the original cylinders, because it then failed to inspect the gas system inside the building. However, as previously pointed out, the code was not in existence in January, 1948. The statements made by the jury forewoman also may possibly have referred to each future change-over of cylinders made by Spooner Electric Service. However, Statz made it clear in his testimony that the future changing of cylinders without inspection was not a violation of the code.

There was no abuse of discretion on the part of the trial court in refusing to grant a new trial because the jury wrongly considered a code violation had occurred when it had not. Even if the continued servicing by changing over cylinders without making an inspection did constitute negligence, the fact that Scalzo's counsel had failed to request a question in the verdict on this point would alone

justify the trial court in denying the motion for new trial based on the afore-described exchange which took place between the forewoman of the jury and the court.

We will state frankly that this court has given serious consideration to whether it should not on its own, pursuant to sec. 251.09, Stats., grant a new trial in the interest of justice with respect to Scalzo's cause of action against Marsh. This is because we are convinced that the jury's finding, that Spooner Electric Service did not make the installation of the burner and accessory equipment in the fall of 1949, is opposed to the great weight of the evidence. We were particularly impressed by the testimony of Metzler, who apparently was an entirely disinterested witness.

However, this court will not exercise this discretion to grant a new trial unless it is convinced that there has been a probable miscarriage of justice, viewing the case as a whole. See *Wells v. Dairyland Mut. Ins. Co.* (1957), 274 Wis. 505, 518, 80 N. W. (2d) 380. We are not so convinced.

The reason for our opinion, that there has been no probable miscarriage of justice, is because we believe the negligence of Scalzo at the time of the explosion exceeded any negligence of whoever made the 1949 installation of the burner and accessory equipment. Scalzo testified that after lunch on the day of the explosion he went down into the basement and put his hand on the outside of the door leading into the smokehouse. Because such door was only lukewarm he knew the fire in the burner had gone out, and he then turned off the shutoff valve thereby shutting off the flow of gas. On his adverse examination before trial he testified, "After I turned off the valve, I got another piece of paper and lit it." However, at the trial he testified that he closed the shutoff valve; opened the smokehouse door; then went upstairs in order to give the smokehouse a chance to air out; and did not attempt to relight the burner until

sometime later. We are inclined to believe Scalzo's first account of what happened, as related by him at the adverse examination, is the true version. Furthermore, we are impressed by the fact that the system and burner had functioned satisfactorily and without accident for nine years prior to the explosion, although extensively used by Scalzo during all of such period.

*Direction of Verdict as to Skelly Oil Company.*

From our review of the record we are in complete agreement with the trial court that there is no evidence in the record which would support a finding that, if Spooner Electric Service did make either of the two installations inside the building, it was then acting as agent for Skelly Oil Company.

Counsel for Scalzo contend that the lease agreement of January 7, 1948, covering the regulator and accessories also extended to the entire gas system, including everything from the cylinders to the burner. This is because of the use of the word "system" in the following provision thereof:

"3. For consumer's convenience in using Skelgas, the company leases to consumer the following Skelgas regulating equipment, viz:

| SYSTEM | | | REGULATORS | |
|--------|------|------------|------|------|
| Type | Quan. | Serial No. | Type | Quan. |
| Aut. | 1 | 330780 | Aut. | 1 |

Extra Items (Show Quantities)
Manifold Blocks:
Pigtails:
Other (describe):
Instruction: Distributor will describe accurately all equipment installed for consumer."

It is clear to us that the word "system" appearing in the quoted portion of the lease is confined to the automatic regulating equipment installed on the outside of the building. Therefore, there is no merit to the contention advanced that such lease extended to the gas system inside of the building consisting of the tubing and pipe, the porcelain-handled, shutoff valve, the venturi tube, and the burner.

The witness Statz testified that the leased equipment located on the outside of the building met all requirements of the liquefied petroleum gases code.

This leaves, as the only remaining question with respect to Skelly Oil Company's liability, the issue of whether it properly odorized the Skelgas which was in the two cylinders connected to the automatic regulator at the time of the explosion.

Sec. Ind 9.01, 2 Wis. Adm. Code, which is also part of the liquefied petroleum gases code, required that such Skelgas be effectively odorized. Sub. (b) of such code section further provides:

"The odorization requirements of sec. Ind 9.01 shall be considered to be met by the use of 1.0 pounds of ethyl mercaptan, 1.0 pounds of thiophane or 1.4 pounds of amyl mercaptan per 10,000 gallons of LP-gas. However, this listing of odorants and quantities shall not exclude the use of other odorants that meet the odorization requirement of sec. Ind 9.01."

The Skelly Oil Company established by many witnesses that all tank cars, thirteen in all, of Skelgas received at Spooner from which the two cylinders in question could have been filled, met such code requirement, which testimony was substantiated by company records. Eleven of such cars had 1.5 pounds of ethyl mercaptan added, one had 1.7 pounds of it added, and one had 1.0 pounds of it added, per each 10,000 gallons of gas. In addition, Statz on October 25, 1958, made

an inspection of Scalzo's plant following the explosion. During the course of such inspection he checked on the gas in the two cylinders present at the time of the explosion, and testified that such gas met the odorization requirement of the code.

The only evidence to the contrary was that of Scalzo who testified that at the time of the explosion he did not smell any gas. Counsel for Scalzo also called as a witness one Van Meter, an employee of Scalzo. Van Meter testified that he went into the locker-plant basement between 12 and 1 o'clock on the day of the explosion and passed within four or five feet of the closed smokehouse door. Counsel then propounded the question of whether Van Meter had noticed any odor of Skelgas. Such question was objected to on the ground that there was no evidence that any gas had escaped at that time into the basement. The smokehouse door was weather-stripped but there might have been some small passage of air or gas through the opening in the wall through which the venturi tube protruded leading from the shutoff valve into the smokehouse. The trial court sustained the objection to the question, and it is now urged that this was prejudicial error. In passing on the issue of the directed verdict we will assume that Van Meter, if he had been permitted to answer the question, would have testified that he smelled no gas.

In *Senft v. Ed. Schuster & Co.* (1947), 250 Wis. 406, 27 N. W. (2d) 464, the plaintiff minor sought to recover for personal injuries sustained as a result of falling while riding as a passenger in an elevator in the defendant's store. The mother and grandmother of the plaintiff testified that the elevator jerked causing the fall. Also the elevator operator testified that the elevator could be jerked, but this was explained to mean that it could be "inched" up and down at the floor level. However, three expert witnesses testified it was mechanically impossible for the elevator to have jerked. The

jury returned a special verdict in favor of the plaintiff, but the trial court on motions after verdict dismissed the complaint, and on appeal this was affirmed. This court in its opinion stated (p. 411):

"Conclusive proof of a mechanical impossibility that the accident could have happened in the manner testified to by plaintiff's witnesses warrants taking the case from the jury."

An issue was presented in *Jacobson v. Milwaukee* (1952), 262 Wis. 256, 55 N. W. (2d) 1, as to how deep was a hole in a public sidewalk in which the plaintiff claimed she had caught her heel. She estimated the depth of such hole at four and a half inches. One Reed also testified to a similar depth although he had not measured it. However, one Wernette, an employee of the city engineer's office, testified that the greatest depth of the depression was one and a half inches. This court held that the testimony of the plaintiff and Reed as to the depth of the hole based on casual estimate must yield to that of Wernette based on actual measurements.

In the instant case the fact, of whether the Skelgas in the two cylinders on the Scalzo premises had been odorized with the proper amount of ethyl mercaptan, was capable of being established by scientific proof of expert witnesses. Not only did the evidence establish that each of the 13 tank cars of Skelgas, from one of which the gas that caused the explosion had been drawn, had been odorized with the proper amount of such chemical, but the expert witness, Statz, who tested the gas remaining in such two cylinders after the explosion, testified that such gas had been properly odorized. Any testimony of a casual observer, to the effect he did not smell gas just prior to the explosion, is not sufficient to raise a jury issue as to the odorization of the gas where the same has been verified conclusively as a scientific fact by proper expert testimony.

Our review of the arguments advanced, and evidence presented, convinces us that Scalzo failed to prove a cause of action against Skelly Oil Company, and, therefore, the trial court properly directed a verdict.

*By the Court.*—Judgments affirmed.