Albert M. BOWMAN, Plaintiff-Appellant,

v.

Edward KAUFMAN, Eugene Mura and Harold Lieber, individually and as copartners, d/b/a EGH Enterprises, Morris Kronitz, James Marshall and American Oil Company, Defendants-Appellees.

No. 61, Docket 29944.

United States Court of Appeals Second Circuit.

Argued Oct. 24, 1967.

Decided Dec. 22, 1967.

Chester A. Hahn, New York City, (Sylvia Miller, New York City, on the brief), for plaintiff-appellant.

John Nielsen, New York City, (Fogarty & Nielsen, New York City, on the brief), for defendant-appellee, Morris Kronitz.

William L. Shumate, New York City, (Cusack, Shumate & Geoghan, New York City, on the brief), for defendant-appellee, American Oil Co.

Before FRIENDLY, KAUFMAN and ANDERSON, Circuit Judges.

ANDERSON, Circuit Judge:

Albert M. Bowman brought this diversity action to recover damages for personal injuries suffered by him while he was at work at an automobile service station owned by the American Oil Company (American) and operated in Manhattan, New York, by EGH Enterprises (EGH) as lessee. The case was tried against American and against Morris Kronitz, owner of the automobile which was the instrumentality of plaintiff's injuries.[1] The jury found in favor of both defendants and plaintiff has appealed. We affirm.

On Sunday afternoon, November 24, 1957, Morris Kronitz, with members of his family got into his 1950 Chrysler automobile in the west Bronx, intending to drive across town. En route Kronitz stopped the car next to the curb on E. 170th Street near the corner of Walton Avenue to let his wife out to do an errand. When she returned to the car, Kronitz started the engine, depressed the clutch, put the car in gear, released the handbrake and engaged the clutch; at the same time he stepped on the gas pedal to accelerate the engine, but the car did not go forward. Kronitz then put his foot on the brake, and turned the front wheels toward the curb to prevent the vehicle from rolling back down the hill on which it was parked.

Kronitz had purchased the second-hand Chrysler about a year before from his brother-in-law, Edward Kaufman, a part owner and operator of the EGH service station. When Kronitz discovered that his car would not operate, he telephoned Kaufman at his home to summon assistance. Kaufman arrived shortly afterward in his own automobile. He inspected the disabled vehicle, and found that it would go neither forward nor backward under its own power. While he was in the car, Kaufman tested the footbrake, and found a "firm, solid pedal" which held the car from rolling on the hill. The emergency brake, however, would not hold. From experience Kaufman knew

---

1. Plaintiff's action against the other named defendants was withdrawn by motion before trial.

that the handbrake on this model car was connected to the rear axle through the drive shaft and the combination of symptoms he had observed caused him to conclude that the rear axle of the Kronitz vehicle was the likely source of the trouble.

With Kronitz at the wheel of his Chrysler, Kaufman with his own car pushed the disabled vehicle a distance of three miles across town, through traffic, to his service station at the corner of Sherman and 10th Avenues in Manhattan. The number of traffic lights along the route which the two cars followed was placed by Kaufman between ten and twelve and he recalled two in particular at which Kronitz had brought his car to a stop, one being at the bottom of a steep hill on 170th Street. Kronitz testified that the footbrake on the car was working at the time, that he used it between thirty and fifty times, and Kaufman noted that the brake lights had gone on when the Chrysler slowed or stopped in front of him. When the two cars reached a point opposite the EGH service station on 10th Avenue, Kaufman pushed the Chrysler forward with enough force to move it up the curb-cut and onto the station property, where Kronitz stopped the car with the footbrake and Kaufman pulled up behind him.

The service station had been designed and constructed by American, and was equipped with two hydraulic lifts located in separate bays. The Kronitz vehicle was outside the bay which had an "X" frame lift with adjustable arms designed to make contact with the underside of the chassis of a vehicle. A small steel guideplate, 9 inches square, was affixed to the floor at the front and to the left of the lift to assist in positioning cars properly. There was a workbench at the back of the bay against the rear wall of the garage, so that when a car was on the lift, there was a space of approximately two and one-half feet between its front bumper and the outer edge of the workbench.

When Kronitz and Kaufman arrived there, a car was already on the "X" lift and Bowman was working on an automobile in the adjacent bay. Kaufman had the car on the "X" lift removed, and asked Bowman to give them a hand in guiding the Kronitz vehicle onto that lift. Bowman took a standing position in front of the workbench, and James Marshall, one of the station attendants, got behind the wheel. Kaufman edged his car up to the Chrysler and pushed it forward so that it would climb a slight incline and roll into the bay. Bowman gave hand signals to Marshall. Nothing was said to Marshall about the brakes on the Chrysler and, after he got in the car, there was no reason to test them, or further occasion to stop the car. As the car mounted the incline it lurched forward into the bay and, as Bowman later testified, "it kept coming and I told him 'Stop, stop.' I yelled 'Stop.'" Marshall testified: "Then I reached for my brakes. Then I discovered I didn't have no brakes. Then I pull the handbrake. It still wouldn't slow. Then I said out of the car, 'out of the way, I have no brakes on the car.'" But by then Bowman could not escape and he was pinned between the car bumper and the workbench. Immediately after the accident McGee, an attendant at the station, tested the footbrake on the car and found that "there was no brake at all."

At the trial Bowman claimed that the brakes on the Chrysler must have been defective for some time prior to the accident, and that Kronitz was negligent in not warning those present at the garage of the fact. The jury found otherwise, and plaintiff's appeal as to Kronitz is based upon certain evidentiary rulings made in the course of trial which he asserts were erroneous. The jury also exonerated American of any fault in connection with the incident and no appeal was taken from the judgment in favor of American on that issue. But the court refused to submit the case against American to the jury on the alternative theory of strict tort liability, or liability without fault, and this, the appellant contends, was error.

The plaintiff's case against Kronitz was based solely on his alleged negligence

in failing to warn the plaintiff or Marshall that the brakes on the Chrysler were defective when it was being pushed into the bay. Although the record contains no direct evidence that the footbrake on the Chrysler was in a noticeably defective condition at any time the car was in Kronitz's control,[2] it was plaintiff's theory that such a condition might be inferred from the fact that the brakes failed to function shortly thereafter, a fact which, he claims, the jury would have been justified in finding from the fact of the accident and the testimony of plaintiff's witnesses Marshall and McGee.

■ Kronitz made no effort through affirmative proof to attribute the mishap to some other factor, e. g., the negligence of Marshall, although it was his intention to suggest as much through the testimony of Sheehan, the police officer who had investigated the accident. In a series of questions, counsel for Kronitz sought to elicit from Sheehan testimony to the effect that none of the witnesses to the accident with whom he had spoken in the course of his investigation had mentioned a failure of brakes as a possible cause of the accident. The defendant's plan was to cast doubt by this negative means upon the plaintiff's version of the accident which ascribed the cause to defective brakes. Thus counsel for Kronitz, anticipating a negative response, asked Sheehan the following question: "Did any one of those people, the parties concerned, make any mention to you about a failure of brakes?" The court refused to permit such testimony unless Sheehan could attribute to a particular witness what he had been told about the accident. This Sheehan was unable to do. But counsel for the defendant was successful in his second effort to get the evidence in when he persuaded the court to rule that Sheehan's memo book and "aided card," which were prepared by the officer either during or shortly after the investigation, were properly admissible under the federal business records statute, 28 U.S.C. § 1732.[3] These exhibits were therefore put into evidence in substitution for the officer's direct testimony to show that nothing had been said to him at the time of his investigation concerning faulty brakes on the Kronitz vehicle. As this was not expressly stated in the memo book,[4] the purpose was to lay the foundation for the drawing of the negative inference that because none of the witnesses was recorded as having mentioned faulty brakes as the cause of the accident, then faulty brakes had nothing to do with it.

■■ While there are no doubt cases in which the business records statutes may properly be used to facilitate the

2. In fact all indications are that the footbrake was fully operative at such times. Thus when Kronitz started from his home, the brake was "working in perfect order" and shortly after the car had become disabled, a "firm, solid pedal" held the car on the 170th Street hill. The footbrake brought the car to rest in traffic, at signals, and, minutes before the accident, stopped it outside the EGH garage. Whereas there is sufficient testimony to support a finding that the hand or emergency brake was not working, the plaintiff did not press this point at trial and, as submitted to the jury, the case against Kronitz was limited to the footbrake.

3. Section 1732 provides:
"(a) In any court of the United States and in any court established by Act of Congress, any writing or record, whether in the form of an entry in a book or otherwise, made as a memorandum or record of any act, transaction, occurrence, or event, shall be admissible as evidence of such act, transaction, occurrence or event, if made in regular course of any business, and if it was the regular course of such business to make such memorandum or record at the time of such act, transaction, occurrence, or event or within a reasonable time thereafter."
A written memorandum made by a police officer in the performance of his official duty comes within the scope of the federal statute, Salsberg v. Modern Transfer Co., 324 F.2d 737 (2 Cir. 1963); Hawkins v. Gorea Motor Express, Inc., 360 F.2d 933 (2 Cir. 1966).

4. Or the "aided card," which was similar to, and actually prepared from, the memo book.

proof of negative facts,[5] we think that this is not one because the likely effect of such proof by indirection here was to substitute unreliable for reliable evidence, contrary to the basic purpose of § 1732. Although under the circumstances we conclude that the court erred in admitting the policeman's relevant memo book entries and "aided card" as business records after refusing to permit the policeman on the witness stand to testify to the same thing, the plaintiff was not prejudiced thereby and the error does not require reversal since the excluded oral testimony, which covered the same evidentiary matter, should have been admitted.

 Where a written record of past events is offered in evidence under § 1732 as a substitute for a witness' testimony at the trial, there must go with the offer, as an implied qualification under the statute, the assurance that the written record is accurate and trustworthy. United States v. Hickey, 360 F.2d 127, 143 (7 Cir.), cert. denied 385 U.S. 928, 87 S.Ct. 284, 17 L.Ed.2d 210 (1966). Although we have repeatedly said that § 1732 should be liberally administered and not interpreted in a "dryly technical way," Korte v. New York, N. H. & H. R. Co., 191 F.2d 86, 91 (2 Cir.), cert. denied 342 U.S. 868, 72 S.Ct. 108, 96 L.Ed. 652 (1951), this does not mean that any particular business record may be admitted without careful scrutiny of its reliability for the purpose for which it is offered as evidence. Thus literal compliance with the mechanical prerequisites of the statute is not always sufficient to make a record admissible, United States v. Grayson, 166 F.2d 863 (2 Cir. 1948); the records or the circumstances under which they are kept should indicate an "inherent probability of trustworthiness" for the purpose for which they are offered. LeRoy v. Sabena Belgian World Airlines, 344 F.2d 266, 274 (2 Cir.), cert. denied 382 U.S. 878, 86 S.Ct. 161, 15 L.Ed.2d 119 (1965).

██ ██ An examination of Sheehan's memo book discloses that it was not in fact a purported "memorandum or record" of what was or was not said concerning the cause of the accident and that it therefore fails to meet the test of reliability implicit in § 1732. The memo gives no hint that Sheehan ever inquired specifically about the brakes on the Kronitz vehicle, or even that he asked generally why the vehicle had failed to stop. Sheehan testified that it was his official duty, in accordance with routine police procedure, to ascertain the causes of the accidents which he investigated from persons who were present at the time and to record this information in his report. In this case he presumably noted in the memo book whatever he had been told by four parties—Bowman, Marshall, Kronitz and Kaufman—yet the book contains no specific information on what might have caused this accident, and in fact devotes but a single phrase to its occurrence—"broke loose and ran into wall pinning aided person Albert Bowman." Although the entries thus give no suggestion that Sheehan was ever told of a brake failure, neither is there anything in his notes which is inconsistent

---

5. The authorities are not in agreement whether the absence of an entry in a business record is evidence of the non-occurrence of an event which would likely be recorded upon happening. See McCormick, Evidence § 290 at 609 n. 13 (1954) and compare, e.g., Scalzo v. Marsh, 13 Wis.2d 126, 108 N.W.2d 163 (1961), taking the affirmative position, with Gravel Products Division of Buffalo Crushed Stone Corp. v. Sunnydale Acres, Inc., 10 Misc.2d 323, 171 N.Y.S.2d 519, 522 (1958), representing the contra New York view. Although § 1732 takes no express position on the matter, Wigmore generally favors the negative use for business records "where an entry naturally would have been made if a transaction had occurred," 5 Wigmore, Evidence § 1531 at 392 (3rd ed. 1940), and a similar view has been codified in both the ALI's Model Code of Evidence, Rule 514(2) and in Rule 63(14) of the Uniform Rules of Evidence, as well as in some state statutes, see e. g., Podvin v. Eickhorst, 373 Mich. 175, 128 N.W.2d 523 (1964) (hospital records).

with this having happened. Under these circumstances we think that the trial court should have permitted Sheehan to testify whether or not any one of those present had said anything about the brakes, rather than to rule that the evidence could come in as a business entry.[6]

■ If Sheehan's testimony had indicated that Marshall had not mentioned brakes to him at the time of his investigation of the accident, this fact would have been relevant circumstantial evidence that the brakes had not failed to operate when the car ran into the plaintiff. Sheehan testified that he spoke to each of the parties named in his memo book, which included Marshall, and, if this is so, it would have been natural for Marshall to have mentioned the brake failure at the time, if he believed that a brake defect had been the cause of the accident. Although proof of Marshall's silence for this purpose involves at least some of the dangers usually associated with hearsay evidence, see McCormick, Evidence § 229 (1954) pp. 476–479, we think that the evidence here was sufficiently probative to have justified its admission, see id. at 479.

Appellant raises two other evidential questions in the case against Kronitz. The first of these involves the so-called "spontaneous utterance" under the "res gestae" exception to the hearsay rule which sanctions the admission of hearsay statements uttered under stress of excitement produced by a startling event and before the declarant has had time to reflect and contrive, see McCurdy v. Greyhound Corp., 346 F.2d 224 (3 Cir. 1965), McCormick, Evidence § 272 (1954). In this case plaintiff's witness McGee testified on direct examination regarding what had happened immediately after the Kronitz vehicle pinned Bowman against the workbench:

> "I was hollering at Jim [Marshall]. I says, 'Jim, why didn't you stop?' He says, 'There was no brakes.'"

Counsel for Kronitz objected to that portion of McGee's testimony which reflected the hearsay response of Marshall and the objection was sustained.

■ We need not expressly decide whether Marshall's statement was admissible as part of the *res gestae* as appellant now contends, since its admission here amounted only to cumulation of later testimony given by Marshall himself, and could not have prejudiced plaintiff's case. We note, however, that, at the time the objection to this testimony was made, counsel for the plaintiff did nothing to apprise the court that he was relying on this particular exception nor did he offer to establish the foundation necessary for its admission. The trial court was thereby deprived of an opportunity to consider and rule on the preliminary fact questions. Rule 46 F.R.Civ.P.; 5 Moore, Federal Practice ¶46.02 (1966 ed.).

■ The third alleged error involved the exclusion of a portion of a written statement signed by Edward Kaufman and offered by the plaintiff as inconsistent with Kaufman's testimony

---

6. Additional considerations of necessity and convenience which may arise when the record maker is either unidentifiable or, through death or other cause, has become unavailable to testify in court, McCormick, Evidence § 281 at 597, likewise have no bearing here where Sheehan was present and called to testify at the trial. When in Winnett v. Detroit United R. Co., 171 Mich. 629, 137 N.W. 539 (1912), the defendant relied on the absence of an entry from a certain record of the Company to show that an accident had not occurred as detailed by the plaintiff, the court commented: "It would, indeed, be a strange rule of evidence which would admit a private book or record to show that an event did not take place, when the witnesses upon whom the record depended for its existence and accuracy could be and were present in court as witnesses." 171 Mich. at 631, 137 N.W. at 540. Although we are well aware that use of business records has been considerably expanded since that decision, we nevertheless think the court's statement applicable to the facts presented here.

at the trial. Kaufman testified, as a witness on behalf of Kronitz, that he could not recall ever having had a conversation with Marshall concerning the brakes on the Kronitz vehicle, and that he had not heard Marshall say "I got no brakes" at the time of the accident. He was at times an evasive witness, and several times the trial judge found it necessary to take over the interrogation in an effort to elicit precise and responsive answers. Making due allowance for the lapse of seven and a half years between the accident and the trial, Kaufman took questionably frequent resort to failure to remember and inability to recall. To attack the witness' credibility, plaintiff offered in evidence a signed statement made by Kaufman on January 21, 1958, about two months after the accident, a portion of which read:

> "He [Bowman] was yelling 'my leg. Why didn't he [Marshall] stop?' * * I asked him what happened and I received an answer from Marshall saying that the brakes did not work."

Upon objection by the defendant, the court permitted plaintiff's counsel to show the quoted portion to Kaufman, without revealing it to the jury, to see if it would refresh his recollection. Kaufman said that it did not. The court then admitted the first part but excluded the last part, "I received an answer from Marshall saying that the brakes did not work," on the ground that the hearsay statement was not sufficiently inconsistent with Kaufman's testimony to qualify

as a prior inconsistent statement. Although this was proper cross-examination for the purpose of attacking Kaufman's credibility and it was error to exclude it, see McCormick, supra, § 34; 3 Wigmore, Evidence § 1040 (3rd ed. 1940), it is unlikely that the plaintiff was prejudiced thereby and the excised portion was not of such crucial importance that this court should hold the mistake to be reversible error.[7]

Plaintiff's case against American was based both on the theory of negligence and on the doctrine of strict tort liability. The court refused to submit the case to the jury on the theory of strict liability and this ruling constitutes the only basis for appeal in regard to plaintiff's case against American.

In short, appellant's argument here is that the design of the service station and of the "X" lift onto which the Kronitz vehicle was being guided was unfit for the purpose for which that portion of the station was intended, in that the lift was not equipped with a safety device to stop a car from over-shooting it, and that there was insufficient space around the lift to assure an employee's safety in the event of such a mishap.

There is no question in this diversity action that the law of New York is controlling. It is not necessary to discuss possible distinctions between a sale and a lease, or between a chattel and real property for the purposes of strict tort liability,[8] because the doctrine of

---

7. Counsel for Kronitz then proceeded in his summation to the jury to take unfair advantage of the court's ruling by suggesting, contrary to known fact, that Kaufman's statement had not contained any reference to the brakes on the Kronitz vehicle. Such conduct is reprehensible and is not excused by the court's erroneous ruling. In view of the court's instruction that the jury disregard the improper argument of counsel, and in view of the fact that it is highly unlikely, in the light of the whole record, that the exclusion of the past contradictory state-

ment had any substantial effect on the result, we do not feel that the plaintiff was so prejudiced that an order for a new trial is warranted.

8. Whatever the viability of those distinctions in other situations, § 402A of the Restatement of Torts (Second) (1965), they have none in a diversity case in this Circuit applying the law of New York. We have before expressed the opinion that the New York Court would reject the former distinction, Delaney v. Towmotor Corp., 339 F.2d 4, 6 (2 Cir. 1964)

liability without fault does not apply in New York to a "defect" as notorious, open, and obvious as the alleged flaw in the construction of the EGH service station. This court has previously noted that the law of strict liability in New York applies only where the alleged defect which causes injury is a latent or hidden one, see Messina v. Clark Equipment Co., 263 F.2d 291 (2 Cir.), cert. denied 359 U.S. 1013, 79 S.Ct. 1150, 3 L.Ed.2d 1037 (1959). Thus in Campo v. Scofield, 301 N.Y. 468, 95 N.E.2d 802 (1950), the New York Court of Appeals affirmed the dismissal of a complaint against the manufacturer of a machine on the ground that the alleged defect, absence of a safety guard, was known to the plaintiff. That position was reaffirmed in Inman v. Binghamton Housing Authority, 3 N.Y.2d 137, 164 N.Y.S.2d 699, 143 N.E.2d 895, 59 A.L.R.2d 1072 (1957), a case which, like the present one, involved a suit against the lessor of real property for injuries allegedly caused by the absence of a safety device from a portion of the demised premises. While recent decisions of the New York Courts have tended towards a broader base for application of the doctrine, see Randy Knitwear, Inc. v. American Cyanamid Co., 11 N.Y.2d 5, 226 N.Y.S.2d 363, 181 N.E.2d 399 (1962); Goldberg v. Kollsman Instrument Corp., 12 N.Y.2d 432, 240 N.Y.S.2d 592, 191 N.E.2d 81 (1963), these cases in no way suggest that the doctrine should apply to a situation involving an obvious and known defect.[9] Therefore, we conclude that the trial court properly refused to submit to the jury the case against American on the strict tort theory.

The judgments are affirmed.

as it has apparently done with regard to the latter, Inman v. Binghamton Housing Authority, 3 N.Y.2d 137, 144, 164 N.Y.S. 2d 699, 703, 704, 143 N.E.2d 895, 898, 899, 59 A.L.R.2d 1072 (1957).

9. Nor are we aware of any case in another jurisdiction which would go so far in a situation involving real property, with the possible exception of Schipper v. Levitt & Sons, Inc., 44 N.J. 70, 207 A. 2d 314 (1965).