**WOOLNER THEATRES, INC. & Drive-In Movies of Louisiana, Inc.**

v.

**PARAMOUNT PICTURES CORPORATION et al.**

Civ. A. No. 15544.

United States District Court,
E. D. Louisiana,
New Orleans Division.
May 5, 1970.

C. Ellis Henican, Jr., of Henican, James & Cleveland, New Orleans, La., Lawrence Alioto, of the Law Offices of Joseph L. Alioto, San Francisco, Cal., Francis Anderson, Philadelphia, Pa., for plaintiffs.

Phillip A. Wittmann and Warren A. Goldstein, of Stone, Pigman, Walther, Wittmann & Hutchinson, New Orleans, La., Stanley Godofsky, of Royall, Koegel & Wells, New York City, for Paramount Pictures Corp. (formerly Paramount Film Distributing Corp.), Metro-Goldwyn-Mayer, Inc., Twentieth Century-Fox Distributing Corp., United Artists Corp., Universal Film Exchanges, Inc. and Warner Bros.-Seven Arts Distributing Corp. (formerly Warner Bros. Pictures Distributing Corp.).

Murphy Moss, of Lemle, Kelleher, Kohlmeyer, Matthews & Schumacher, New Orleans, La., Roy W. McDonald, of Donovan, Leisure, Newton & Irvine, New York City, for Buena Vista Distribution Co., Inc.

George A. Raftery, of O'Brien, Driscoll, Raftery, Rosenbloom & Grainger, New York City, Charles M. Lanier, of Phelps, Dunbar, Marks, Claverie & Sims, New Orleans, La., for NOTR Corp.

Gibbons Burke and Charles E. Richards, Jr., of Chaffe, McCall, Phillips, Burke, Toler & Sarpy, New Orleans, La.,

for ABC Mid-South Theatres, Inc. and Canal Realty & Improvement Co.

BOYLE, District Judge.

Woolner Theatres, Inc. and Drive-In Movies of Louisiana, Inc., operators of drive-in theatres in the New Orleans area, brought this motion picture anti-trust action against the major motion picture distributors and certain down-town New Orleans exhibitors alleging these defendants conspired to distribute and exhibit better quality first-run motion pictures on an exclusive first-run basis in downtown theatres in violation of 15 U.S.C. § 15. Plaintiffs prayed for injunctive relief and damages.

The plaintiffs urge the admission of Profit and Loss Statements[1] (hereafter P&LS) for their fiscal years which are embraced in the damage period 1961–1965. They contend that the P&LS should be received under the Federal Business Records Act (28 U.S.C.A. § 1732). They also claim that McDaniel v. United States (5th Cir. 1965) 343 F.2d 785, cert. den. 382 U.S. 826, 86 S.Ct. 59, 15 L.Ed.2d 71, holding that summaries of books and records are admissible "provided cross-examination is allowed and the original records are available" (p. 789), requires admission of the exhibits.

The defendants have objected to their receipt in evidence on the ground that they do not qualify for admission under the Act.

These documents represent critical evidence in the plaintiffs' case to prove injury and damage. In view of the serious charges of fraud on the part of the plaintiffs in the relevant period and in the period 1954–1959, wherein the plaintiffs concede that they defrauded defendants of a film rental on about $78,-000.00 of box office admissions receipts through a system of underreporting, diversion of box office receipts to another corporation owned, operated and controlled by the individuals who owned, operated and controlled the plaintiffs' corpo-

rations in both periods, and fraudulent record keeping, a foundation hearing, out of the presence of the jury, was held.

On the evidence presented, and not presented, and the law as we understand it to be, we held the offered exhibits inadmissible because the plaintiffs, having the burden to do so, have failed to convince us of the truthworthiness of the P&LS.

We believe the authorities support the conclusion that admissibility of records under the Act is to be adjudicated not only on a showing that records were kept in the regular course of business and that it was the regular course of business to keep the records, Doss v. United States, 355 F.2d 663 (8th Cir. 1966), but also on a determination, where the evidence requires, of the character of the records and their earmarks of reliability. United States v. Grow, 394 F. 2d 182 (4th Cir. 1968). Mechanical compliance with the Act is not always sufficient to qualify business records for admission thereunder. The records or the circumstances under which they are kept should indicate an "inherent probability of truthworthiness for the purpose for which they are offered." Bowman v. Kaufman, 387 F.2d 582, 587 (2d Cir. 1967); LeRoy v. Sabena Belgian World Airlines, 344 F.2d 266 (2d Cir. 1965). See also Palmer v. Hoffman, 318 U.S. 109, 63 S.Ct. 477, 87 L.Ed. 645 (1943); Hartzog v. United States, 217 F.2d 706 (4th Cir. 1954); Mo. Pac. RR Co. v. Austin, 292 F.2d 415 (5th Cir. 1961); Sabatino v. Curtiss Nat'l Bank, 415 F.2d 632 (5th Cir. 1969).

The P&LS were prepared by plaintiffs' Memphis bookkeeper to whom were sent, during a period from early 1960 until about October, 1962, re-written copies of the cashier's daily box office reports, and thereafter, a monthly summary of the claimed daily receipts. Additionally, the bookkeeper received duplicate bank deposit slips, check registers and cancelled checks. From these records the bookkeeper prepared and maintained

1. Plaintiffs' Exhibit 20.

a double entry set of formal books. The bookkeeper prepared the P&LS and various tax returns, including income tax returns [2] of the plaintiffs and their sister corporation, Southern Concessions, Inc.

Although the defendants concede that the P&LS reflect accurately the information furnished by the plaintiffs to their bookkeeper, they vigorously challenge the correctness of the gross receipts information furnished by plaintiffs, the reasonableness of certain expenses deducted and the propriety of others.

The evidence shows that the keystone record regularly and usually maintained in a theatre operation is a daily box office report of ticket sales maintained by the box office cashier. Determination of tax liabilities, percentage rentals due film companies and the operator's financial condition, of course, depend, among others, on accurate receipts records. Here, a daily cashier's box office report was made, showing, among other data, gross sales and ticket numbers sold.

The evidence shows that from about April, 1960 to April, 1965 these vital records were destroyed within weeks or months, and perhaps daily on occasions. A partial re-write of those reports was made by Mrs. Betty Woolner, wife of Lawrence Woolner, one of the co-owners of plaintiffs. Until about October, 1962, these re-writes were sent to the bookkeeper, who was not aware they were not the original box office reports. After October, 1962, the monthly summaries, themselves re-writes scheduled on a single sheet, were submitted to the bookkeeper. This change apparently was designed to eliminate the bulk of the monthly mailing to the bookkeeper (see Deposition of Robert S. Jacobs, p. 48).

The evidence also shows that the plaintiffs fraudulently reported to the film companies lower gross receipts on which they paid percentage film rentals, which they were obligated to pay on true grosses under film license contracts, rather than on the actual receipts.[3] Other records kept by Mrs. Woolner bear out the fraud which, on trial, Mrs. Woolner admitted, but on deposition denied.[4] It is claimed, however, that the fraud was practiced only in about half the 1961–1965 period.

The evidence also shows that similar fraudulent record keeping and other practices which prevailed in the 1960–1965 period also prevailed in the 1954–1959 period. Nevertheless, plaintiffs claim that notwithstanding the fraud practiced on the film companies, their true gross receipts were banked and reported to their bookkeeper. They also maintain that the P&LS are in agreement with their income tax returns.

In this connection it is noted that the income tax returns of the plaintiff, Woolner Theatres, Inc., operator of the Airline Drive-In for the fiscal years ending January 31, 1961, 1962 and 1963 and of the plaintiff, Drive-In Movies of Louisiana, Inc., operator of the Jeff Drive-In, for the fiscal years ending April 30, 1962, 1963 and 1964, reflect lesser gross profits than the P&LS. Further, the evidence shows that payments, made in the period June, 1959 to November, 1962 (see Defendants' Exhibits 32 & 33) to cover film rentals of which plaintiffs defrauded defendants in the period 1954–1959, were included in the film rental figures appearing in the P&LS and the tax returns, the plaintiffs having failed to inform their bookkeepers of the character of such payments. At the same time the amount of receipts to which such payments would be applicable are not included in the gross receipts shown in both.

There is also evidence that even if the cashier's reports were available they,

<hr />

2. Income Tax Returns of Woolner Theatres, Inc., FYE January 31, 1961— FYE January 31, 1965, inclusive, and of Drive-In Movies of Louisiana, Inc. FYE April 30, 1962—FYE April 30, 1965, inclusive.

3. The film license contracts required the plaintiffs to keep records which accurately reflected gross ticket sales receipts and serially numbered tickets.

4. Deposition of Mrs. Betty Woolner, pp. 45, 46.

themselves, would not guarantee the gross receipts shown in the P&LS because sales of tickets after closing of the box office were not included.

Plaintiffs failed to offer any of the records of their satellite corporation, Southern Concessions, Inc., to which, in the 1954–1959 period, box office receipts were diverted and in whose bank account they were deposited.

■ Considered along with all other evidence on the issue, the tax returns are themselves suspect and are entitled to no weight in determining whether the gross receipts figures in the P&LS are trustworthy.

Destruction of basic records after lapse of an appropriate time and for legitimate reasons is the regular course of business in some businesses. Tax conscious prudent businessmen may destroy, and their accounting and legal advisers may counsel destruction of, vital records after civil and criminal tax statutes of limitations have run. Destruction in this case occurred, relatively, if not actually, almost simultaneously with the re-write of the primary record. Evidently, some attempt was made to maintain records through re-writes of the originals, which it was hoped would withstand the scrutiny of the Internal Revenue Service, and at the same time thwart discovery by film companies of plaintiffs' fraud as to them. It has not succeeded for the latter purpose and its success for the former is dubious. Re-writes of basic records made for such purposes would not be records kept in the regular course of business. United States v. Grow, supra; United States v. Plisco, 192 F. Supp. 337, aff'd 113 U.S.App.D.C. 177, 306 F.2d 784, cert. den. 371 U.S. 948, 83 S.Ct. 505, 9 L.Ed.2d 499.

Mrs. Woolner, referring to the change over to keeping the monthly summary, testified the bookkeeper, Jacobs, advised the institution of the system. If she would thus create the impression that Jacobs advised the destruction of the basic records, we are not impressed. Jacobs, testifying on this subject, explained the "only reason" the change

from sending the bulk mail (the re-writes of the cashier's reports, which he did not know were not the original reports) into one sheet (the monthly summary) "was merely for mailing purposes" (Deposition p. 48). He further testified that although he did not specifically recall instructing the plaintiffs how long the basic records should be retained, he would "usually tell a client that they should keep records at least five years (Deposition p. 16, L L 14–18). This suit was filed in April, 1965; no doubt it was contemplated considerably earlier. Had Jacobs' usual advice to clients been observed, or had plaintiffs not had ulterior motives, the basic records, which plaintiffs so desperately need now, would have been available back to April, 1960 at least, and would doubtlessly be available today. It is inconceivable that those records would have been destroyed after the suit was filed, or even after the decision was made to file the suit, if they would not indict plaintiffs.

We are convinced that the basic records were not destroyed routinely and in the regular course of business. We are convinced that they were systematically destroyed in an effort to conceal fraud.

Plaintiffs' Exhibits 11 and 12 are summaries prepared by the witness Caldwell, purporting to show the play off of each theatre for the relevant period and the "gross receipts" and "film rentals." As to the latter information, the offer of the exhibits, as evidence on the merits, has been withdrawn, the plaintiffs conceding that the gross receipts and film rentals as shown are not correct. And, as to other information contained therein, effort is being made to reach stipulation thereon when revised to correctly reflect the data intended to be shown.

These exhibits are in evidence on the issue of admissibility of the P&LS. Mr. Caldwell's testimony shows that these exhibits cannot be considered to support the accuracy of the P&LS, which Mr. Caldwell had never seen.

In addition to Mrs. Betty Woolner, who characterized herself as office manager for plaintiffs, Sam H. Talley, the gen-

eral manager of the plaintiffs, testified. Bernard Woolner, plaintiff's president, whom Mrs. Betty Woolner testified directed her to underreport receipts to the film companies, and Lawrence Woolner, brother of Bernard and also a principal in the plaintiff corporations, who, it appears, was the architect of the system by which the 1954–1959 fraud was perpetrated, were not called as witnesses.

The perjurious character of some of Mrs. Woolner's testimony, the inconsistencies within other portions and with that of Mr. Talley, Talley's role in the 1954–1959 fraud, the inconsistencies in certain of his testimony with facts otherwise proven, the deceit practiced by the plaintiffs on Jacobs and Caldwell, indeed, even on their counsel in this case [5] which, in turn, was calculated to practice fraud even on the jury and Court, the clear proof of fraudulent record keeping in the period involved, the destruction of basic records, other means employed to effect the scheme to defraud the defendants, and the adverse presumption arising from the failure to call witnesses who could be expected to have material information and to produce records of Southern, compelled our conclusions that:

1. The plaintiffs have failed to establish the probable trustworthiness required for admission of the P&LS under the provisions of 28 U.S.C. § 1732.

2. The P&LS are inadmissible under the summaries rule. Cross-examination of some, but not all, persons who would have information concerning the records was available to the defendants. The cross-examination of those available adversely reflect on the trustworthiness of the summaries. The original basic records, the cashier's box office reports, which are the foundation of the summaries, were not, of course, available.

5. Counsel for plaintiffs in his opening statement to the jury on April 6, 1970 stated that the plaintiffs did underreport their receipts to the film distributors, but since 1959 there had been no under-
reporting. The admission by Mrs. Woolner that there had been underreporting in years subsequent to 1959 came in her testimony on April 23, 1970 in the foundation hearing.